Johnnie KNOWLTON, et al.,
Plaintiffs–Appellees,

v.

GREENWOOD INDEPENDENT
SCHOOL DISTRICT,
Defendant–Appellant.

No. 90–8636.

United States Court of Appeals,
Fifth Circuit.

March 20, 1992.

Rehearing Denied April 16, 1992.

James P. Boldrick, Miles R. Nelson, Boldrick & Clifton, Midland, Tex., for defendant-appellant.

Jamis Herd, Tex. Ass'n of School Boards, Austin, Tex., for amicus curiae (Tex. Assn. of School Boards).

Melissa Hirsch, Eva–Marie Leahey, Odessa, Tex., for plaintiffs-appellees.

Before WILLIAMS, HIGGINBOTHAM, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

This action springs from cafeteria workers blowing the whistle, loud and clear, on being required to "voluntarily" serve meals, after hours and without pay, to the Board of the Greenwood (Texas) Independent School District. The School District appeals from an adverse judgment on claims under the Free Speech Clause of the First Amendment, the Fair Labor Standards Act (FLSA), and the Texas Whistle Blower Act. Because the speech in issue was not of public concern, we REVERSE and RENDER on the First Amendment claim. We AFFIRM the judgment on the FLSA claim and liability under the Whistle Blower Act; but, because the damages awarded under the Act are uncertain, we REMAND for a new trial on that aspect.

I.

Plaintiffs Linda Hopper, Johnnie Knowlton, Cheryl Casbeer, Terry Mansell, and Frances Popham were employed in the School District's food service program. Hopper managed the elementary school cafeteria, in which Knowlton, Casbeer, and Mansell also worked. Popham managed the high school cafeteria. In the fall of 1988, food service director Donna Smith informed Hopper and Popham that a volunteer program would be instituted for that school year, requiring the high school and elementary cafeteria workers to prepare and serve meals at monthly, after hours, school board meetings.[1]

Meals were served at each Board meeting during the 1988–89 school year. The workers were not asked to keep time records, nor were they paid for the work. Among the meals served were a Christmas and an "end of school" meal, for which workers from both cafeterias brought food prepared at their expense in their homes (for which they were not reimbursed). On these two occasions, they were allowed to eat with the Board.

Prior to the beginning of the next school year, Smith informed the workers that the program would continue. Contrary to the procedure for the prior year, all workers had to be present to serve. Meals were served for the first three meetings. The day after the November meeting, Smith informed the workers that, for the December meeting, they were to bring food from their homes (as had been done the previous December). Unlike the previous Christmas and "end of school" meals, however, they would not be allowed to eat with the Board.

At this juncture, the workers expressed their dissatisfaction with preparing and serving the meals after regular working hours and without pay. Hopper informed Smith that the program was causing problems; Smith replied that she would discuss the matter with Superintendent Hal Porter.

Porter and Smith met with all cafeteria workers (six each from each cafeteria) on December 5. The workers identified several problems, including not being paid. Porter responded that he would consider the matter and that another meeting would take place.

Two days later, on December 7, Smith informed the workers that Porter had decided that they would (1) not be required to serve Board meals for the remainder of that school year, (2) have to sign a contract stating they were "subject to assignment" before being rehired for the next, and (3) no longer be permitted to work at school extra-curricular functions (i.e., football and basketball games), which their families had been able to attend and from which they had earned extra income. Smith also instructed Hopper and Popham to meet with Porter and her that afternoon.

During that afternoon meeting, Porter stated that the workers would be paid for meals already served during 1989–90, and that the program would not be continued for the remainder of that school year. No mention was made, however, of pay for

1. Smith testified that she "needed a volunteer from each kitchen when it was their designated month[;] if there [were] not enough volunteers, then [she] would have to appoint a worker to be on duty."

meals served the previous year. Porter also stated that the workers would have to sign a contract stipulating that they were "subject to assignment", triggering a discussion concerning that term. Hopper asked, among other things, if it meant that they would have to resume feeding the Board during the next school year; Porter responded "I just can't say".

The discussion became heated. Porter asked several times whether Hopper was not going to do as he said; she replied that if it meant the meal program would continue as it had, then "I guess that is what I am saying". At that point, Porter stood up and stated "it is time for you to go".[2] Hopper then told Smith that six workers would be needed in the elementary school kitchen the next morning; Porter replied that he had it covered. Hopper and Popham felt that they had been fired. Hopper, who had been speaking on behalf of the other elementary cafeteria workers, relayed the events of the meeting to them. Mansell, Knowlton, and Casbeer also felt that they had been fired.

Later that afternoon, Hopper and Popham informed Board President Vicky Moody and Board members Johnny Womack and James Brooks that several of the workers had been fired. That evening, the workers (and others) met with Moody, Womack, and Brooks "to try to get our jobs back". Moody assured the workers that, as at-will employees, they were not required to sign contracts, including one containing the term "subject to assignment". Moody then telephoned Porter and asked him to attend the meeting.

Upon Porter's arrival, the conversation again became heated. He emphasized that his position was unchanged, that all cafeteria workers would work "subject to assignment". He was again asked whether "subject to assignment" meant the meal program would be reinstated the following school year; he again replied "I just can't say". Porter stated that the workers had not been fired, but would have to talk to either him or Smith before they could come back to work. He stated, however, that Hopper would not be allowed to return under any circumstances, because she had quit her cafeteria employment once before. Porter left; Board President Moody stated that the next day (December 8) would be a "cooling off" period; and the meeting ended.

That next day, however, the workers read in the newspaper that their positions were being filled. That same day, they requested an emergency Board meeting; but Porter stated that they would have to wait until December 18, the next scheduled meeting. The workers received the hearing on December 18; by that time, however, their positions had been filled.

The workers sued in district court on numerous federal and supplemental state claims.[3] Summary judgment was granted the School District on all but the sex discrimination (Title VII), FLSA, First Amendment free speech, and Texas Whistle Blower Act claims. At trial, the Title VII claim was before the district judge; the rest, before a jury, which, through interrogatories, returned a verdict for the workers on the FLSA, free speech, and whistleblower claims, awarding approximately $600,000.[4] The district court later ruled for the School

---

**2.** Concerning Porter's concluding the meeting, Popham testified that

[h]e was very upset. And, in fact, he had his fist on the table, he was red in the face and he was yelling at the top of his voice, "It is time for you all to go".

**3.** They claimed (1) sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981; (2) age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.; (3) violation of the Texas Whistle Blower Act, Tex.Rev.Civ.Stat.Ann. art. 6252–16a (Vernon Supp.1992); (4) deprivation of a prop-

erty interest without due process under 42 U.S.C. § 1983 and the Fourteenth Amendment; (5) violation of the FLSA, 29 U.S.C. § 201 et seq.; (6) defamation; (7) denial of free speech, assembly and association under § 1983 and the First Amendment; (8) bad faith; and (9) intentional and negligent infliction of emotional distress.

**4.** The jury awarded to each worker $5,000 for past, and $5,000 for future, mental anguish and $100,000 for punitive damages; and it awarded a total of approximately $32,000 for lost wages and $1,100 for the FLSA violation.

District on the Title VII claim. The School District was unsuccessful on its several post-judgment motions, including for judgment notwithstanding the verdict (JNOV), and for a new trial grounded on juror partiality.

## II.

The School District raises numerous issues, including that (1) the district court abused its discretion in denying a new trial; (2) it should have been granted judgment on the speech claim; (3) the evidence was insufficient to support finding FLSA violations; (4) it is not liable, for several reasons, under the Whistle Blower Act; and (5) punitive and mental anguish damages and prejudgment interest were erroneously awarded.[5]

### A.

■ The School District's new trial motion asserted that, although asked on voir dire, juror Velda Keith failed to disclose knowledge of pertinent facts and a previously formed opinion about the case. In support, it submitted the affidavit of George Smith, who stated that, prior to trial, he had discussed these items with Keith at her employer's office. After receiving testimony from Keith and Smith among others, and considering several affidavits, including from two other jurors, the district court found that Keith had not formed a prior opinion.

■ A district court's decision whether to grant a new trial because of juror misconduct is reviewed only for an abuse of discretion. *Maldonado v. Missouri Pacific Ry.*, 798 F.2d 764, 769 (5th Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 762 (1987); *Carson v. Polley*, 689 F.2d 562, 580 (5th Cir.1982). Keith testified that she had no pre-trial knowledge or

opinion of the case and had not discussed it with Smith. Two jurors, through affidavits, stated that Keith did not act improperly during deliberations and did not indicate any prior knowledge of the case. Keith's daughter, who worked for her mother's employer, testified that she may have been the person to whom Smith had spoken. There was no abuse of discretion.

### B.

Whether speech is protected by the First Amendment is a question of law to be determined by the court. A public employee's speech is entitled to judicial protection under the First Amendment only if it addresses a matter of "public concern." This "must be determined by the content, form, and context of a given statement, as revealed by the whole record." If the speech does not address a matter of public concern, a court will not scrutinize the reasons motivating a discharge that was allegedly in retaliation for that speech. Appellate courts review *de novo* the question of whether the speech at issue addresses a matter of public concern.

*Dodds v. Childers*, 933 F.2d 271, 273 (5th Cir.1991) (footnotes omitted) (quoting *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983)).

■ If the speech in question does not address a matter of public concern, the inquiry ends.[6] When the School District moved for a directed verdict at the close of the workers' case, maintaining, among other things, that the speech in question did not involve public concern, the district court denied the motion without comment. In its instructions, it submitted both threshold issues (public concern and balancing, see note 6) to the jury. But these are legal

---

**5.** The Texas Association of School Boards, as *amicus curiae*, filed a brief in support.

**6.** If the public concern hurdle is cleared, a second threshold requirement involves balancing "'the interests of the [employee], as a citizen, in commenting upon matters of public concern [against] the interest of the State, as an employer, in promoting the efficiency of the public

services it performs through its employees.'" *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991) (brackets in *Coughlin*) (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)). If the balance is struck in favor of the employee, the case is submitted to the jury on causation. *Id.*

issues for the court, not the jury, which we review *de novo*.

■ Because the complaints to Porter included working without pay, a FLSA violation, the workers maintain that the public concern test was met. "Issues rise to the level of public concern if an individual speaks primarily in his role as a citizen rather than as an employee, or if the information conveyed is of 'relevance to the public's evaluation of the performance of governmental agencies.'" *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir.1991) (footnote omitted) (quoting *Day v. South Park Indep. School Dist.*, 768 F.2d 696, 700 (5th Cir.1985), *cert. denied*, 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986)). *Accord Caine v. Hardy*, 943 F.2d 1406, 1416 (5th Cir.1991) (en banc), *petition for cert. filed*, (U.S. Dec. 20, 1991) (No. 91–1007). Although "[t]he existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern[,] ... an employee cannot transform a personal conflict into an issue of public concern simply by arguing that individual concerns might have been of interest to the public under different circumstances." *Dodds*, 933 F.2d at 273 (footnote omitted).

The record reflects that the workers' concern was the effect of the meal program on their employment and personal lives, rather than public interest in FLSA violations. They did object to working without pay; but equal, if not greater, concerns arose from interference with family life and being required to hire baby sitters and travel at night. These are private, not public, concerns. The speech in issue does not cross the first threshold; we can proceed no further.[7]

## C.

■ The FLSA provides for a minimum hourly wage, a 40–hour work week, and overtime pay. 29 U.S.C. §§ 206, 207.[8] In challenging the FLSA award, the School District contends that the meal program was voluntary. This is simply an assault on the jury finding that the workers had "worked non-voluntary hours for which they received no compensation".

■ "In reviewing the sufficiency of the evidence to support the jury verdict, [we] consider all of the evidence, drawing all reasonable inferences in favor of the prevailing party." *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275, 1297 (5th Cir.1988), *cert. denied*, 490 U.S. 1091, 109 S.Ct. 2432, 104 L.Ed.2d 988 (1989). We do not reweigh the evidence; it is the jury's province, of course, to weigh conflicting evidence, draw inferences from the evidence, and make credibility determinations. *Id.* Nor can a jury verdict be set aside merely because a different result could have been reached; "its decision must be accepted if the record contains any competent and substantial evidence tending fairly to support the verdict." *Id.* "Substantial evidence, while something less than the weight of the evidence, is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if different conclusions also might be supported by the evidence." *Id. See also, e.g., Kiepfer v. Beller*, 944 F.2d 1213, 1217 (5th Cir.1991).

---

7. The School District asserts that for all the claims in issue (speech, FLSA, and whistleblower), the workers (1) were required to prove that the complained of actions resulted from a governmental "policy or custom", and (2) waived any right to recovery by failing to request a jury instruction on policy. For the § 1983 speech claim, our reversal renders these issues moot. The School District cites no authority that "policy or custom" is an element of either a FLSA or whistleblower claim. Moreover, in seeking JNOV, its assertions regarding "policy or custom" were limited to the § 1983 claim. Because this theory was not raised in the district court, we decline to consider it on appeal. *E.g., Parker Plaza West Partners v. UNUM Pension & Ins. Co.*, 941 F.2d 349, 351 n. 4 (5th Cir.1991).

8. Damages are double the amount of unpaid compensation. 29 U.S.C. § 216(b) provides:

Any employer who violates the provisions of section 206 or section 207 ... shall be liable to the employee ... affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

Based on this narrow standard of review, the School District's challenge is without merit. For example, several witnesses testified that, despite the term "voluntary", the workers were required to serve the meals. When Smith, the workers' supervisor, announced that the program would be continued in 1989–90, she stated that all workers would be present to serve. Furthermore, she testified that, if not enough workers volunteered, "then [she] would have to appoint a worker to be on duty."

## D.

The Texas Whistle Blower Act provides in part:

> A state or local governmental body [including a public school district] may not suspend or terminate the employment of, or otherwise discriminate against, a public employee who reports a violation of law to an appropriate law enforcement authority if the employee report is made in good faith.

Tex.Rev.Civ.Stat.Ann. art. 6252–16a, § 2 (Vernon Supp.1992). In answer to the first four interrogatories, the jury found that the workers had (1) been discharged or constructively discharged by the School District; (2) reported a FLSA violation to an appropriate law enforcement authority; (3) reported in good faith; and (4) been discharged because of the reported violation. The School District asserts primarily that the jury's response to the next interrogatory (number 5) is a finding of no liability under the Act; there is insufficient evidence to prove discharge; at-will employees may not recover under the Act; and the workers did not make a pre-discharge report to an appropriate law enforcement authority.[9]

### 1.

■ Interrogatory number 5 asked whether the workers "were discharged for a nondiscriminatory reason". Despite its above listed answers to the first four, the jury answered "yes". The School District maintains, as it did seeking JNOV, that this response constitutes finding no liability under the Act.[10] In denying JNOV on this basis, the district court ruled that the jury's finding that the workers had been discharged because of the reported FLSA violation was sufficient to support the verdict; that, therefore, "the answer to Question 5 can be disregarded as both factually and legally unnecessary and unrelated to the issues in this case."

■ If jury answers appear to conflict, the Seventh Amendment requires the court "to reconcile the answers, if possible, in order to validate the jury's verdict." *White v. Grinfas*, 809 F.2d 1157, 1161 (5th Cir.1987). "In reconciling apparent conflict, we must determine whether 'the answers may fairly be said to represent a logical and probable decision on the rele-

---

9. In its reply brief, it contends, for the first time on appeal, that the report was not made in good faith, as required by the Act. This court has repeatedly held that it is improper to raise an issue for the first time in a reply brief, because the appellee is afforded no opportunity to respond. *E.g., Blumberg v. HCA Management Co.,* 848 F.2d 642, 646 (5th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 781 (1989); *Nissho–Iwai Co. v. Occidental Crude Sales, Inc.,* 729 F.2d 1530, 1539 n. 14 (5th Cir. 1984); *Knighten v. Commissioner,* 702 F.2d 59, 60 n. 1 (5th Cir.), *cert. denied,* 464 U.S. 897, 104 S.Ct. 249, 78 L.Ed.2d 237 (1983). Accordingly, we decline to address this issue.

10. The court had instructed the jury in part as follows:

You are instructed that in order to recover under the [Whistle Blower] statute as to each plaintiff, each plaintiff must prove by a pre-

ponderance of the evidence [that] she was discharged or constructively discharged by the defendant, she was so discharged after reporting a violation of law and for the reason she made such a report, and her report was made in good faith. If you find that any plaintiff was discharged or suspended … after reporting a violation of law, and such report was made in good faith, you must then presume that plaintiff was discharged or suspended in violation of the Whistle Blower[ ] Statute.

The defendant may rebut this presumption by offering evidence and proving the defendant fired such plaintiff for a nondiscriminatory reason. If you find any plaintiff was discharged or constructively discharged by the defendant, and such plaintiff established the elements of her claim under the Whistle Blower[ ] Statute by a preponderance of the evidence, that plaintiff is entitled to compensatory damages.

*vant* issues as submitted.' " *Rideau v. Parkem Indus. Servs., Inc.*, 917 F.2d 892, 896–97 (5th Cir.1990) (quoting *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir.1973) (emphasis in *Rideau* )).

The response to number 5 is inconsistent—in fact, totally at odds—with the overall response to the first four. The fifth interrogatory is redundant to number 4 and, standing alone, confusing. Perhaps, the jury linked it with the sex discrimination claim being tried to the district judge. In any event, its first four answers "represent a logical and probable decision on the *relevant* issues as submitted"—that the workers had been discharged because of their good faith report of a FLSA violation to an appropriate authority. The first four answers reflect its unambiguous decision that the workers proved all of the elements necessary to recover under the Act. "We will not allow a puzzling answer to an irrelevant question to impeach the jury's clear verdict...." *Id.* at 897.

### 2.

▮▮▮▮ The School District next contends that the evidence is insufficient to support the jury's finding that the workers were discharged or constructively discharged. Therefore, we apply the earlier discussed standard of review to this challenge. "If there is an evidentiary basis upon which the verdict can be supported, the jury's determinations will be left undisturbed, even where there is substantial contradictory evidence that could have supported an opposite verdict." *Gibraltar*, 860 F.2d at 1297.

As noted, Popham testified that at the December 7 meeting she and the other cafeteria manager (Hopper) had with Porter, he became angry, put "his fist on the

table, [and] yell[ed] at the top of his voice, 'It is time for you all to go.' " When Hopper responded that replacements would, therefore, be needed in the kitchen the next morning, Porter replied that he had it covered. Hopper and Popham believed they had been fired;[11] the other workers, for whom Hopper had been speaking, believed they were fired. At the meeting later that evening, although Porter stated that the workers were not fired, he also stated that Hopper could not return under any circumstance, and that the others could not return unless they spoke first with him or Smith. Furthermore, the following day, although Board president Moody had stated that it would be a "cooling off" period, the workers read a newspaper article which stated that their positions were being filled. The record clearly contains "competent and substantial evidence tending fairly to support" finding that the workers were discharged.

The School District points out several instances of conflicting and contradictory evidence in the record. However, "[w]eighing the conflicting evidence and the inferences to be drawn from that evidence, and determining the relative credibility of the witnesses, are the province of the jury." *Id.* This court does not reweigh evidence or set aside a verdict because a different result could have been reached. Instead, we determine only if reasonable jurors could agree with this verdict, *id.* at 1297–98; we find that they could.[12]

### 3.

▮▮▮▮ In Texas, "employment for an indefinite term may be terminated at will and without cause." *Winters v. Houston Chronicle Publishing Co.*, 795 S.W.2d 723,

---

11. Popham testified:
   Anytime a man raises his fist on his desk, is red in the face, yelling at the top of his voice, "It is time for you to go", I was fired.

12. Regarding the elements for discharge, the district court instructed the jury as follows:
   Plaintiffs say that they were discharged from their employment with [the] School District, or in the alternative, were constructive[ly] discharged from that employment.... The defendant ... says that all of the plain-

tiffs voluntarily quit their employment.... You are instructed that an employee is constructively discharged if she can prove by a preponderance of the evidence that her employer rendered her working conditions so intolerable that she was compelled to quit voluntarily.
   Because reasonable jurors could find that the appellees were discharged, we need not address whether it was actual or constructive.

723 (Tex.1990). The workers were at-will employees. The School District asserts that, as a matter of law, such employees are not "public employees" under the Act. This contention is without merit.

The Act states: " 'Public employee' means a person who performs services for compensation under a written or oral contract for a state or local governmental body. The term does not include an independent contractor." Tex.Rev.Cit.Stat. Ann. art. 6252–16a, § 1(3) (Vernon Supp. 1992). In *Winters,* the Texas Supreme Court noted that the Act is one of several legislative restrictions on the at-will doctrine. 795 S.W.2d at 724.

#### 4.

Under the Act, a claimant must prove "that the law enforcement authority to whom he reported the alleged violation of law was an *appropriate* authority." *City of Dallas v. Moreau,* 697 S.W.2d 472, 474 (Tex.App.—Dallas 1985, no writ) (emphasis in original).[13] As noted, the jury so found. The workers contend that Superintendent Porter was the authority, with the report made during the December 5 meeting, prior to discharge two days later. The School District maintains that, as a matter of law, the Superintendent was not an appropriate authority. *City of Dallas* holds that

> in order to be "appropriate," the authority to whom the report is given must have the power and the duty under the law to decide disputes concerning the lawfulness of the matter being reported, the power and the duty to order a halt or a change in the matter reported, the power to legislate or regulate with respect thereto, or the power to arrest, prosecute

or otherwise discipline on account of an alleged violation being reported.

*Id.*

Further, in *Travis County v. Colunga,* 753 S.W.2d 716, 719 (Tex.App.—Austin 1988, writ denied), the court noted that the legislature intended the term "appropriate" to be "sufficiently elastic in its meaning to accommodate [public officers and bodies or] any other civil authorities having powers and duties sufficient to compel obedience to what the law requires in the particular case." Moreover, the use of the word "an" in the statutory phrase contemplates that there may be more than one "appropriate" authority in a given circumstance. *Id.* In this light, *Colunga* held that

> the statutory expression, "an appropriate law enforcement authority," includes at minimum *any* public authority having the power and duty of inquiring into the lawfulness of the questioned conduct and causing its cessation if the conduct appears to be in violation of the law. *Cf. City of Dallas v. Moreau,* 697 S.W.2d at 474.

753 S.W.2d at 719–20 (emphasis in original).

In Texas, "[t]he superintendent is the ... administrative manager of the school district." Tex.Educ.Code Ann. § 13.351(a) (Vernon 1991). Smith testified that, when the workers stated that they would contact the Board about their problems with the program, she "asked them not to speak to the board members[,] because it wasn't the board members that instituted the program, it was the superintendent[; and, therefore,] if they had a complaint, they needed to approach me or Mr. Porter."[14] Board President Moody testified that Porter, as superintendent, had the authority to (1) hire and fire school employees, and (2) "to take care of the situation" (workers serving the Board without pay). Porter testified that he was aware of the illegality

**13.** The Act provides that the whistleblower report must be made to "an appropriate law enforcement authority". Tex.Rev.Civ.Stat.Ann. art. 6252–16a, § 2 (Vernon Supp.1992).

**14.** Hopper testified that, when the Board meal program was instituted, Smith told her that Porter (who was then the elementary principal) wanted to try it, because it had worked well at another location where he had been employed. Moreover, during the first year, and at the end of a Board meal, Hopper refused a donation from some Board members, made upon their learning that the workers were not being paid. The next day, Porter and Smith came to Hopper's cafeteria and thanked the workers for not accepting the donation.

of requiring employees to work without pay, and, moreover, that he had the "power" to ensure that no employee did so.

██ In sum, Superintendent Porter controlled the meal program, and had "the power and duty of inquiring into the lawfulness of the questioned conduct and causing its cessation if the conduct appear[ed] to be in violation of the law." *Colunga,* 753 S.W.2d at 719–20. In fact, he did so. He was "an appropriate law enforcement authority" for the report.[15]

### E.

██ The district court instructed the jury that it could award punitive and mental anguish damages proximately caused by violation of free speech rights and the Whistle Blower Act. The jury was directed, first, to "[f]ind the amount of damages, if any, to [the workers] which were proximately caused by [the School District's] whistleblower violation or freedom of speech violation." The jury considered three categories of damages (past, and future, mental anguish, and lost wages), without the award being separated between free speech and the Act. If damages (other than nominal) were awarded, and malice found, the jury was to award

exemplary damages. Again, the damages were not separated for the two claims.

Obviously, because the speech claim should not have been submitted to the jury, any damages for that claim cannot stand. The jury was entitled, however, to award whistleblower damages. Because we cannot distinguish between those awarded for the free speech claim, if any, and the whistleblower claim, if any, we must remand for a new trial on damages for the latter.

██ It is, therefore, unnecessary to consider most of the School District's challenges to the award of punitive and mental anguish damages.[16] We reject, however, the contention that punitive damages cannot be awarded under the Whistle Blower Act. Specifically, it contends that, as a quasi-municipal corporation, it is not liable for such damages under Texas law. The plain language of the Act torpedoes this claim—"[a] public employee who sues under this Act may recover ... exemplary damages". Tex.Rev.Civ.Stat.Ann. art. 6252–16a, § 4(a)(2). It provides public employees a cause of action against, *inter alia,* a "local governmental body", which it states includes a public school district. *Id.* at § 1(2)(C).[17]

15. Three other contentions fail. First, because Porter was an appropriate authority for the workers' December 5 report, and because discharge took place later, the contention that no pre-discharge report occurred is moot. Second, citation to *Travis County v. Colunga,* 753 S.W.2d 716 (Tex.App.—Austin 1988, writ denied) for the contention that a report to a "single individual ... cannot be considered a report to the appropriate law enforcement authority" is misplaced. *Colunga* did not so hold, and, indeed, upheld a report to a single member of a county Commissioners Court as a report to an appropriate authority. *Id.* at 720. Third, the workers were not required to report to an entity with "supervisory authority over Porter". As noted, there may be more than one *appropriate* authority in a given instance. What is required is a report to an "authorit[y] having powers and duties sufficient to compel obedience to what the law requires in the particular case." *Id.* at 719. Porter was such an authority.

16. Because we remand, we do not address the School District's contentions that (1) there was insufficient evidence for awarding mental anguish damages; (2) the district court erred in not requiring a separate specific or affirmative

finding of malice before awarding punitive damages; and (3) the punitive damages award is unreasonable, because it does not bear a reasonable relationship to actual damages.

The School District also argues that Texas standards for imposition of punitive damages are unconstitutional, citing *Pacific Mutual Life Insurance Co. v. Haslip,* —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). It did not raise this issue in district court. "[I]ssues raised for the first time on appeal 'are not reviewable by this court unless they involve purely legal questions and failure to consider them would result in manifest injustice.'" *United States v. Garcia–Pillado,* 898 F.2d 36, 39 (5th Cir.1990) (quoting *Self v. Blackburn,* 751 F.2d 789, 793 (5th Cir. 1985)). Although this is a legal issue, there is no manifest injustice; it is included in our remand for a new trial on whistleblower damages.

17. In *City of Ingleside v. Kneuper,* 768 S.W.2d 451, 456 (Tex.App.—Austin 1989, writ denied), the court noted that, at the time the Act was passed, the general rule in Texas was that municipalities and other governmental agencies were not liable for punitive damages. "Accordingly, [when the Act was passed] there was a

### F.

 The School District's final contention is that the district court erred in awarding prejudgment interest for part of the damages. Because we have reversed and rendered on the § 1983 free speech claim and have remanded for a new trial on damages on the whistleblower claim, we address only whether it may be imposed for the FLSA award.

Concerning such interest, this circuit has created a distinction between claims under 29 U.S.C. § 216 (action to recover unpaid minimum wages, unpaid overtime compensation and liquidated damages), and § 217 (injunction). Prejudgment interest is not available for the former; it may be awarded for the latter. *Compare Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 357 (5th Cir.1990) ("pre-judgment interest is not available for § 216 claims") *and Peters v. City of Shreveport*, 818 F.2d 1148, 1168–69 (5th Cir.1987) (same) *with Marshall v. Hope Garcia Lancarte*, 632 F.2d 1196, 1199 (5th Cir.1980) (permitting prejudgment interest award under § 217) *and Brennan v. City Stores, Inc.*, 479 F.2d 235, 242 (5th Cir.1973) (same). Although "[t]he reason for distinguishing between section 217 and section 216 for purposes of prejudgment interest is not readily apparent", this panel is bound by prior circuit precedent. *See Peters*, 818 F.2d at 1168. The FLSA claim is under only § 216. Accordingly, prejudgment interest may not be awarded for the FLSA damages.

### III.

For the foregoing reasons, we AFFIRM the judgment on the FLSA claim (except that we VACATE prejudgment interest on the unpaid wages) and the School District's liability under the Texas Whistle Blower Act, but REMAND for a new trial on the issue of damages under that Act and to amend the judgment on FLSA prejudgment interest. For the First Amendment claim, we REVERSE and RENDER for the

logical reason for the Legislature to have included in the Act a general provision for the recovery of exemplary damages: without such a pro-

School District, and therefore VACATE that part of the judgment.

vision, it would likely have been determined that such damages were not recoverable at all from the offending governmental body." *Id.*