BENAVIDES, Circuit Judge,
dissenting:
The majority reviews the evidence and concludes that the manner in which the racking board was used was not a “reasonable anticipated use.” But because there is evidence from which a reasonable jury could conclude otherwise, I am compelled to dissent.
In reviewing a jury verdict, our standard is clear: we must view all of the evidence in favor of the prevailing party. Weighing the conflicting evidence and the inferences to be drawn from it is the province of the jury; its decision must be accepted if the record contains any competent and substantial evidence tending to support the verdict. Gann v. Fruehauf Corp., 52 F.3d 1320, 1326 (5th Cir. *811 1995); Knowlton v. Greenwood Indep. Sch. Dist., 957 F.2d 1172, 1178 (5th Cir.1992). “If there is an evidentiary basis upon which the verdict can be supported, the jury’s determinations will be left undisturbed, even where there is substantial contradictory evidence that could have supported an opposite verdict.” Gibraltar Sav. v. LDBrinkman Corp., 860 F.2d 1275, 1297 (5th Cir.1988), cert. denied, 490 U.S. 1091, 109 S.Ct. 2432, 104 L.Ed.2d 988 (1989), accord Knowlton, 957 F.2d at 1178. I believe the majority loses sight of this standard.
The majority opinion accurately reflects the events surrounding this drilling rig accident. While acting as derrickman, Hunter was maneuvering pipe into a racking board. The floorhands positioned the pipe at ground level. It is undisputed that the pipes were initially given positive lean, albeit less than desirable. Hunter tied the pipe to the back handrail of the racking board with sashcord which, as the majority notes, is common. As each successive pipe was tied to the previous one, the pipes grew at the top creating a negative lean. The latches on the back handrail failed; the pipes crashed forward; Hunter was killed.
In absolving KREMCO of liability, the majority seizes upon the existence of negative lean and uses it to craft an exclusion from “reasonably anticipated use.” In doing so, it usurps the function of the jury and Hunter’s right to the jury’s decision. In its answer to jury question two, the jury found that Hunter’s death was caused by an unreasonably dangerous characteristic of the racking board during a reasonably anticipated use. Given our standard of review, we must uphold this verdict if there exists evidence in the record to support that conclusion, even if there is substantial evidence to the contrary. In this case, there is evidence that both negative lean itself is common and the overall use of the racking board was routine.
At trial, rig operator Danny Ray testified that pipe is always tied to the back handrail. Ray examined a diagram showing negative leaning pipe and testified as follows:
Q: In looking at this diagram, Mr. Ray, in looking at the way this pipe is racked, is this something that is common to you or at least seen by you out there in your work as an oil well service operator?
A: Yes, sir. Just about any time you trip pipe it always — it’s tight at the bottom, but as you (sic) collars butt up against one another you’re coming out of it, it mushrooms at the top. Kind of flares out. Gets bigger.[1]
On cross examination, in direct response to whether it is common practice to lean pipe toward the mast, Ray testified: ‘You have to kind of do it the way you — to get the job done, you know? Not all wells are perfect and you just kind of gotta do the job the best you can. If you’re tripping 12 or 14 thousand foot of pipe and you can space out the bottom some and it will throw some lean back in it once the pipe starts getting too much on you.” Further, on redirect Ray was asked: “You have racked pipe with it leaning towards the mast before, haven’t you?” Ray responded, “yes, sir, I have.”[2]
In addition to Ray’s testimony, rig operator Charles Berry testified that when they started tripping the pipe the workers used three to four inches of positive lean. He confirmed that pipe is always tied to the handrails.[3] He also examined the same ex- *812 Mbit showing negative leaning pipe that Ray described as commonplace and testified that the pipe looked the same way on the day of the accident.[4]
Unquestionably, there is conflicting evidence. Hunter’s own expert, Kenneth Kai-gler, testified that while he had seen negative leaning pipe it was not common. Likewise there is ample testimony that negative lean could be corrected by “kicking out” the pipe at the bottom. Nonetheless, there remains the testimony of Ray and Berry that a jury could find credible and conclude that the racking board was being used in a manner that was common.[5]
Moreover, the majority’s focus on the “tree” of negative lean obscures the “forest” of reasonably anticipated use. The evidence at trial reflects that the pipe was initially being racked with positive lean. It was secured to the back handrail as was common. As the pipe was being racked, it grew larger as expected. As a result, there was negative lean. At this point, the workers negligently failed to correct the lean. This failure, however, does not lead to the conclusion that the overall use of the board was not a reasonably anticipated one. Rather, the workers’ failure to correct the lean speaks to their comparative fault. The jury clearly understood this and found both Hunter and his co-workers partially at fault.[6] The workers’ negligence should not, however, insulate KREMCO from its own fault. Viewing the entire context of the use of the racking board prior to the accident, a reasonable jury could conclude that it was being used in a manner that was reasonably anticipated by the manufacturer.
Consequently, I am unpersuaded by the analogy the majority draws with other examples where a manufacturer would not be liable under Louisiana law. At issue here is not a foreseeable, yet bizarre, use of a product such as using a soda bottle as a hammer or driving a car across water. Maj. op. at 807. Rather, the evidence reflects that the racking board was being used for its intended purpose (to rack pipe) and in a manner that a jury could conclude was common.
The majority’s reliance on Lockart v. Kobe Steel Ltd. Constr. Mach. Din, 989 F.2d 864 (5th Cir.1993), is also unpersuasive because of its procedural posture. In Lockart, two workers lifted a steel pontoon by chaining it to the teeth of the bucket scoop of an excavator. The workers then worked underneath the suspended pontoon. The chain slipped from the teeth dropping the pontoon on the workers. While we found that using an excavator to suspend a pontoon was not a reasonably anticipated use, we did so after conducting our own independent review of the evidence as is our standard for summary judgment review. We held that “in this instance in which the manufacturer provided a clear warning, the product was handled by experienced users, and no hard evidence was of *813 fered to rebut these facts, we must affirm the judgment of the district court.” Lockart, 989 F.2d at 869. Unlike Lockart, in this controversy we review a jury’s verdict and must give deference to that verdict if there is support in the record. This is true even if there is substantial contradictory evidence that could support the opposite. We are not free to review the evidence de novo and draw our own conclusion on reasonably anticipated use.
Viewing the record in the light most favorable to the verdict, I would conclude that there is some evidence that the jury could credit that negative lean itself is common. Moreover, properly viewed in context, the overall use of the racking board was also routine. The jury found that Hunter’s death occurred during this reasonably anticipated use of the racking board. I would stay out of the jury box and affirm.[7]

. The majority argues that because Ray could not quantify the degree of negative lean in the diagram that no reasonable jury could credit this testimony. The majority does not, however, deny that the diagram does illustrate negative leaning pipe and that the diagram, Plaintiff's Exhibit 29.16, was introduced into evidence and was before the jury.

. The majority Claims that it is unreasonable to conclude from Ray's testimony that negative lean was common. Obviously, the majority is unpersuaded and readily discounts Ray’s testimony. I quote from the testimony directly to support my view that a reasonable jury could conclude otherwise.

.On cross-examination. Berry was asked: “It’s true, isn’t it, Mr. Berry, that that handrail isn’t meant to take the weight of all that pipe, is it; isn’t that true?” Berry replied: "I’m going to put it like this if I may, I have tied pipe to handrails every time I have ever worked derricks on a drilling rig or a workover whether it’s from the side handrail or the back handrail.” In addition to Ray’s testimony that pipe was always tied to the back handrail and Berry’s testimony that he always tied to a handrail, derrickman *812 Kenneth Willoughby was asked, "How have you secured pipe in the racking board in your 18 years of experience when there wasn't a chain up there to secure it in the racking board?" Wil-loughby responded: "Tie it off with sash cord or some kind of rope to your back handrail.” The majority likewise concedes that "[ajccording to the testimony, however, pipes are often tied to the back handrail.” Maj. op. at 805 n. 1.

.Berry was asked: "I will refer you to Plaintiff's Exhibit 29.16. Mr. Berry, would you say that the pipe looked about as shown in this illustration that we have marked as Plaintiff's Exhibit 29.16?” He answered: "From my point of angle, yes, sir, that would be just about it right there.” The majority erroneously claims that I characterize Berry as stating that negative lean was common. It was Ray who testified that the diagram showing negative lean was common. Berry merely confirms that the diagram reflected the lean of the pipe on the day of the accident.

. The majority claims that in determining whether the manufacturer should have reasonably expected negative lean, Kaigler's testimony "is of far greater importance than that of the rig workers.” Maj. op. at 809-10 n. 7. This is precisely the type of interference with the jury’s province that we should eschew. Despite the majority's unwillingness to find the workers' testimony credible, the jury could. This is especially true given the fact that the founder of KREMCO testified that they did not make any assumptions as to how the customer would use the racking board. Maj. op. at 808-09 n. 5.

. The jury found that Hunter’s death was caused by his own negligence and assessed 5% fault to him. It found that his death was also caused by the negligence of employees of Mosley Well Service and apportioned their fault, 35%, against Mosley Well Service.

. Because of the majority's resolution of the anticipated use issue, it did not reach whether the racking board was unreasonably dangerous. Having reviewed the record, I would conclude that there is ample evidence to support the jury’s verdict on this issue as well. In an effort not to unnecessarily lengthen this dissent, I would note that there was expert testimony of alternative designs and safety mechanisms, existing at the tíme of manufacture of the racking board at issue, which would have prevented Hunter’s death. This evidence not only supports the jury’s conclusion on an unreasonably dangerous product, but provides additional evidence from which a reasonable jury could conclude that the manufacturer should have anticipated negative lean; it appears that other manufacturers did.