**Revised July 8, 1999**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 98-40230

_____


TOM TEAGUE
and
DAVID BURKETT,

Plaintiffs-Appellants,

VERSUS

THE CITY OF FLOWER MOUND, TEXAS; DAVE BRUNGARDT;
WESS JONES; PARKER-JONES, INC.; TERRY WELCH;
BILL PARKER; and BOBBY JONES,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Texas

_____

July 6, 1999

Before SMITH, DeMOSS, and STEWART, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


Plaintiffs Tom Teague and David Burkett appeal a summary judg-
ment entered in their retaliation case, asserting that they were
reprimanded and ultimately discharged for exercising their First
Amendment right to free speech.  Concluding that the speech in
question does not primarily address a matter of public concern, we

affirm.

I.

Teague and Burkett were long-time police officers employed by the Flower Mound Police Department who had exemplary performance records and had been recognized as "Officers of the Year." Teague was the department's designated internal affairs officer, and Teague and Burkett served in a supervisory capacity in the Criminal Investigation Division ("CID").

In December 1995, they became aware of possible wrongdoing by fellow officer Wess Jones; specifically, they suspected him of aggravated perjury. Pursuant to his internal affairs role, Teague placed Jones on administrative leave and, beginning December 10, 1995, undertook an investigation. Because of the criminal nature of Jones's suspected wrongdoing, Burkett began a parallel criminal investigation into Jones's conduct.

When Chief of Police Dave Brungardt learned of the investigations, he requested that Teague and Burkett keep him apprised of their progress. On December 20, after learning from the Town Attorney that Burkett was going to present a case against Jones to a grand jury, Brungardt put a stop to the investigations but hired the outside private investigating firm Parker-Jones, Inc. (Parker-Jones"), to look into Jones's potential wrongdoing. Parker-Jones cleared Jones of all wrongdoing, after which Jones was returned to regular duty.

Upset with Jones's vindication, in light of what they felt was (as stated in Teague's affidavit) "substantive and uncontroverted evidence that there was probable cause to believe that Wess Jones had violated several sections of the Texas Penal Code, and internal Flower Mound personnel rules," Teague, Burkett, and other officers requested a meeting with Brungardt. Brungardt refused, explaining that the district attorney's office had investigated the matter and had also cleared Jones of any wrongdoing. On hearing this, Teague called assistant district attorney Kevin Henry, who informed him that the district attorney had not looked into the Jones matter at all. This led Teague and Burkett to believe that Brungardt was covering up for JonesSSa suspicion bolstered by the fact that Brungardt had developed a close relationship with Jones since Jones had become president of the police union.

Pursuant to city rules, Teague, Burkett and another supervisor filed a grievance against Brungardt, which was presented to him on January 27, 1996. These officers also requested that Brungardt permit them to meet with Town Manager Ron Ragland regarding these issues. Permission was initially granted, but withdrawn only three days later.

In the meantime, on January 15 Brungardt transferred Teague and Burkett out of CID, at their request. Burkett's replacementSSRon NottinghamSSinformed Brungardt that the CID had an enormous backlog of cases in the wake of Teague's and Burkett's supervisory tenure. This prompted Brungardt to launch an

3

investigation into Burkett and Teague, which was commenced by Parker-Jones on January 31, on which date Brungardt gave Teague and Burkett administrative warnings and placed them on administrative leave. Additionally, every other officer who had signed the January 27 grievance petition was in some way reprimanded on either January 30 or 31.

In May 1996, the Parker-Jones investigation into Teague's and Burkett's supervision of the CID concluded that they had been derelict in their duty. In June 1996, Brungardt fired them, where-upon they appealed their terminations to Ragland, who sustained Brungardt's decision on July 22, 1996.

## II.

Teague and Burkett sued the city, Brungardt, and Parker-Jones and its principals, claiming a trio of constitutional violations: retaliation in violation of the First Amendment; denial of their right to assemble and to petition the government under the First Amendment; and denial of due process under the Fifth Amendment. Defendants denied any constitutional violations and invoked quali-fied immunity.

The court granted summary judgment for defendants on all claims, finding an absence of any constitutional deprivation. Teague and Burkett appeal only on the retaliation claim, thereby abandoning their other constitutional claims. *See Yohey v. Col-*

4

*lins*, 985 F.2d 222, 224-25 (5th Cir. 1993).

Regarding retaliation, the court found that Teague's and Burkett's speech was not a matter of public concern and therefore did not qualify for First Amendment protection. *A fortiori*, Brungardt was afforded qualified immunity, and the city was held not liable.

III.

There are four elements to an employee's First Amendment retaliation claim against his employer:

> First, the Plaintiffs must suffer an adverse employment decision. *See Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir.1997). Second, the Plaintiffs' speech must involve a matter of public concern. *See Thompson v. City of Starkville*, 901 F.2d 456, 460 (5th Cir.1990) (citing *Connick v. Myers*, 461 U.S. 138, 147 . . .(1983)). Third, the Plaintiffs' interest in commenting on matters of public concern must outweigh the Defendants' interest in promoting efficiency. *Id.* (citing *Pickering v. Board of Education*, 391 U.S. 563, 568 . . . (1968)). Fourth, the Plaintiffs' speech must have motivated the Defendants' action. *Id.* (citing *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287 . . . (1977)).

*Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999). The focal point of the instant dispute is whether the second of these elements has been established: whether plaintiffs Teague and Burkett have alleged facts sufficient to show that their speech addressed a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 147 (1983). This determination is a question of law,

5

*see Coughlin v. Lee*, 946 F.2d 1152, 1156 (5th Cir. 1991), so we decide it *de novo*. *Id.*

Building on the seminal employee speech case of *Pickering v. Board of Educ.*, 391 U.S. 563 (1969), the *Connick* Court explained that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole court record." *Connick*, 461 U.S. at 147-48. In language particularly relevant here, *Connick* elaborated on its general rule:

> We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147.

Since *Connick* was decided in 1983, our circuit and others have grappled with defining the contours of its test and its holding, as we applied it to a variety of settings.[1] The instant case involves

---

[1] *See, e.g., Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1269-70 (5th Cir. 1992) (employee's reports of sexual harassment perpetrated against her and others deemed a matter of public concern); *Urofsky v. Gilmore*, 167 F.3d 191, 195-96 (4th Cir. 1999) (law "restricting state employees from accessing sexually explicit material on computers that are owned or leased by the Commonwealth unless given permission to do so . . . regulates the speech of individuals speaking in their capacity as Commonwealth employees, not as citizens, and thus . . . does not touch upon a matter of public concern"); *Tang v. Rhode Island*, 163 F.3d 7, 10-13 (1st Cir. 1998) (stating that state employee's allegations of workplace harassment did not constitute a matter of public concern); *Gardetto v. Mason*, 100 F.3d 803, 812-14 (10th Cir. 1996) (reasoning that plaintiff's "advocacy to obtain a vote of 'no confidence'" in a "highly visible public official" was a matter of public concern); *Swineford v. Snyder County Pa.*, 15 F.3d 1258, 1270-72 (3d Cir. 1994) (plaintiff's complaint against county commissioner's office regarding election improprieties

(continued...)

speech that is of both public and private concern.  We know that it involves a matter of public concern, because our circuit's caselaw has established that speech regarding police misconduct constitutes a matter of public concern.[2]  We recognize, however, that the speech involves a matter of private concern as well, as in the past we have held that speech concerning the conditions of one's employment is a private matter.  *See Gillum v. City of Kerrville*, 3 F.3d 117, 120-21 (5th Cir. 1993).  Thus, we are faced with the challenge of applying *Connick* to a "mixed speech" situation.

Our first foray into the realm of mixed speech cases in the wake of *Connick* was *Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360 (5th Cir. 1986), in which we concluded that our obligation in mixed speech cases is "to decide whether the speech at issue . . . was made *primarily* in the plaintiff's role as citizen or primarily in his role as employee."  *Terrell*, *id.* at 1362 (emphasis added).  Unfortunately, the facts of *Terrell* are a bit peculiar, so its holding is not squarely on point:  It  concerned the plight of a public employee who "was fired when his secret diary, which was critical of his supervisor, fell into the supervisor's hands."  *Id.* at 1361.  Because of these unique circumstances, we

---

[1](...continued)
deemed a matter of public concern); *Havekost v. United States Dep't of the Navy*, 925 F.2d 316, (9th Cir. 1991) (plaintiff's complaints about Navy commissary supervisor, which led to his discharge, not a matter of public concern).

[2] *See Forsyth v. City of Dallas*, 91 F.3d 769, 773-74 (5th Cir. 1996); *Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir. 1988).

were able to find that the plaintiff "made no effort to communicate the contents of [his diary] to the public, and the evidence does not suggest that he would have had any occasion to do so." *Id.* at 1362-63. This finding belied plaintiff's assertion that his was a matter of public concern, and enabled us to hold that his was a matter of "wholly intragovernmental concern." *Id.* at 1363.

Three years later, we revisited the issue of mixed speech in *Moore v. City of Kilgore*, 877 F.2d 364 (5th Cir. 1989), in which we reiterated that whether speech should be characterized as a matter of public concern depends on its "content, context and form." *Moore*, 877 F.2d at 369-70. These factors "must be considered as a whole package, and [their] significance . . . will differ depending on the circumstances of the particular situation." *Id.* at 370. In applying that standard, we looked carefully at each of the factorsSScontent, context, and form. *Id.* at 370-72. No single one was presented as dispositive. *Id.* Fortunately, the facts of *Moore* are more prosaic, and their examination sheds some light on the case before us.

The plaintiff in *Moore* was a fireman who challenged his suspension following statements he made critical of the fire department. *Id.* at 367-68. These statements occurred during a press conference following the tragic death of a fireman on the day after Christmas. *Id.* In sum, the plaintiff blamed the fireman's deathSSin partSSon layoffs. *Id.* This drew the wrath of plaintiff's

8

superiors, and he was reprimanded and suspended.  *Id.*

We found that the content was of public concern (insofar as the public "cares deeply about the ability of its Fire Department to respond quickly and effectively to a fire," *id.* at 370), and the context of the speech suggested a matter of public concern (in that the statements were made during a press conference, *see id.* at 371).  In examining the "form" of the speech, however, we noted that plaintiff's comments "do involve a hint of personal 'employee' considerations."  *Id.*  Evidence for this came from the fact that plaintiff had complained about the layoffs from their beginning, causing him to remark "I told you so" to his superiors following the tragedy.  *Id.*  Nevertheless, his "speech as a whole . . . considering content, context, and form together . . . involve[d] a matter of public concern."  *Id.*

Thus, *Terrell* established, and *Moore* squarely applied, a balancing test approach to the treatment of mixed speech cases in this circuit.  In cases involving mixed speech, we are bound to consider the *Connick* factors of content, context, and form, and determine whether the speech is public or private based on these factors.[3]

The three-factor test has been summarized, at times, as a test to determine whether one is speaking as a citizen or as an em-

---

[3] *See, e.g., Thompson v. City of Starkville*, 901 F.2d 456, 463-65 (5th Cir. 1990) (applying three-factor balancing test).

9

ployee.[4]  The seeds of this summary version of the three-factor test were planted, of course, in *Terrell*, in which we said that "our task is to decide whether the speech at issue in a particular case was made primarily in the plaintiff's role as citizen or primarily in his role as employee."  *Terrell*, 792 F.2d at 1363.  The utility of this shorthand approach is limited somewhat by the fact that it may be inappropriate in particular factual situationsSSsuch as when the employee in question is a public ombudsman.  *Cf. Warnock v. Pecos County*, 116 F.3d 776, 780 (5th Cir. 1997).  Nevertheless, more often than not the "citizen versus employee" test will point us in the right direction, and so we consider it here, in conjunction with the more lengthy three-factor balancing test we have described.

That test was developed further in *Gillum v. City of Kerrville*, 3 F.3d 117, 121 (5th Cir. 1993), in which we indicated our desire to elevate the roles of context and form over content: "[The] focus [is] on the hat worn by the employee when speaking rather than upon the 'importance' of the issue."  Such an approach is preferable to a raw content or heavily content-based analysis, because "we are chary of an analytical path that takes judges so uncomfortably close to content based inquiries."  *Id.*

---

[4] *See, e.g. Dodds v.* Childers, 933 F.2d 271, 273 (5th Cir. 1991)(stating that "issues rise to the level of public concern if an individual speaks primarily as a citizen rather than as an employee"); *Ayoub v. Texas A & M Univ.*, 927 F.2d 834, 837 (5th Cir. 1991)(holding that plaintiff's pay discrimination complaint did not constitute a matter of public concern, because he "consistently spoke not as a citizen . . . but rather as an employee").

Unfortunately, cutting against our established precedent is some broad language in *Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1269 (5th Cir. 1992), that has led the instant plaintiffs to believe that public employee speech falls outside of First Amendment protection only if it "consist[s] exclusively" of employee-employer concerns. *Wilson*, 973 F.2d at 1269. Similarly, plaintiffs read *Benningfield v. City of Houston*, 157 F.3d 369, 374 (5th Cir. 1998), in which we stated that "review by a federal court is improper where the speech involves matters of solely personal interest," as implying that federal review is proper in all *mixed* speech cases.

We do not read *Wilson* and *Benningfield* as do the plaintiffs. For one thing, their results would be unworkable: The mere insertion of a scintilla of speech regarding a matter of public concern would make a federal case out of a wholly private matter fueled by private, non-public interests. Not surprisingly, therefore, plaintiffs have not produced a single case in which such a lax standard has actually governed; that is, we have seen no case in which mixed speech of a predominantly private character has been afforded constitutional protection. In fact, such a reading of *Wilson* and *Benningfield* would create a split among the circuits.[5] Moreover, the rule of orderliness forbids one of our panels from overruling a

---

[5] *See, e.g., Hartman v. Board of Trustees*, 4 F.3d 465, 471-72 (7th Cir. 1993) ("When the speaker's motives are mixed, as often they are, the speech will not be found to raise a matter of public concern if 'the overriding reason for the speech,' as determined by its content, form and context, appears to have been related to the speaker's personal interests as an employee.").

prior panel; to the extent that *Wilson*'s language contradicts the "primary role"/balancing test of *Terrell* (and *Moore*), decided years earlier, it is of no effect. *See Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997).[6]

We affirm on the basis of these tests. In terms of content, we acknowledge that the speech in question was predominantly public. Speech concerning police misconduct is public in content. *Forsyth*, 91 F.3d at 773-74. In terms of context, however, Teague's grievance is more appropriately characterized as private: It was made in the setting of a private employee-employer dispute. Although "[t]he fact that the Plaintiffs chose to file internal grievances rather than publicize their complaints is not dispositive," *Benningfield*, 157 F.3d at 375, this evidence does most certainly suggest that the speech was private in context, rather than public.[7]

Finally, the speech in question is undeniably private in form. Teague's grievance letter opens with "I was removed from the position of Internal Affairs Investigator with a phone call at 10:00 o'clock at night with no explanation." It ends with "I believe I have exhausted all reasonable means to clear myself

---

[6] *Benningfield* does not even mention *Terrell* or *Moore*, and *Wilson* cites only *Terrell*.

[7] We are, of course, aware of the fact that plaintiffs did attempt to take their grievance to the town manager (Ragland). This was not, however, an attempt to make the matter public, but rather simply an effort to go over Brungardt's head by appealing to someone with supervisory authority over him.

12

from those allegations which caused my removal from an otherwise routine internal affairs investigation." The grievance submitted by Teague and Burkett to Ragland contained more of the same, expressing "the need to be given a fair hearing concerning our handling of [the Jones] investigation."

Taking these three factors together, and weighing the latter two (context and form) more heavily as required by *Gillum*, we conclude that the speech is not entitled to First Amendment protection. When taken as a whole, the statements of Teague and Burkett were primary of private concern.

Utilizing the simpler "citizen versus employer" approach produces to the same result. During all relevant events, Teague and Burkett were acting in their capacity as employees embroiled in an employment dispute. Their focus (following their reprimands) was primarily on clearing their namesSSnot on rooting out police corruption *per se*. Closely on point and arguably controlling is *Gillum*, 3 F.3d at 120-21, in which we held that a plaintiff who was fired after "speaking to his superior officers about police corruption" did not state a federal claim, because he spoke primarily in his role as an employee and not as a citizen. As we explained, "To be sure, corruption in an internal affairs department is a matter of public concern. [Plaintiff's] focus was, however, on the issue insofar as it impacted his wish to continue his investigation." *Id.* at 120.

Thus, under either the three-factor balancing test of *Terrell* or the summary "citizen versus employee" dichotomy applied in *Gillum*, Teague and Burkett do not enjoy the First Amendment protections of citizens speaking to a matter of public concern. Although interspersed with apparently genuine concerns regarding police wrongdoing, Teague's and Burkett's grievances were primarily motivated by, and primarily addressed, concerns particular to their private interests. For this reason, the district court correctly dismissed their retaliation claims, and we need not reach the issue of qualified immunity or municipal liability.

AFFIRMED.