United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 15, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-40465

_____

DINO CHAVEZ,

                                        Plaintiff-Appellant,

versus

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT; ET AL

                                        Defendants

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT; NOE SAUCEDA, in his
official capacity

                                        Defendants-Appellees.

--------------------
Appeal from the United States District Court
for the Southern District of Texas
Civil Action No. 1:02-CV-128
--------------------

Before KING, Chief Judge, and GARZA and BENAVIDES, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge: *

     In this direct civil appeal, Plaintiff-Appellant Dino Chavez

challenges the district court's rulings granting motions to

dismiss and summary judgment on behalf of Defendants-Appellees

Noe Sauceda and the Brownsville Independent School District

---

     *      Pursuant to 5TH CIR. R. 47.5, the Court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

1

("BISD"). For the reasons that follow, we affirm.

## I. FACTUAL BACKGROUND

The BISD maintained an optional Section 125 Cafeteria Plan through which school employees could purchase insurance policies with pre-tax income. Chavez, as a regional manager for the American Family Life Assurance Company ("AFLAC"), administered the plan each year, starting in 1998, and received commissions from AFLAC for selling insurance policies to BISD employees.

The parties dispute what position, other than agent for AFLAC, Chavez held with regard to the administration of the BISD's cafeteria plan. Specifically, the BISD contests Chavez's assertion that he served the BISD as the *de facto* Third Party Administrator ("TPA") of the plan. Under Texas law, a TPA is "a person who collects premiums or contributions from or who adjusts or settles claims in connection with life, health, and accident benefits." TEX. INS. CODE § 21.07-6(1). It appears that Chavez performed the duties of a TPA without compensation so he could sell AFLAC's products to the BISD's employees. However, it is clear that the BISD did not have a contractual relationship with Chavez for these services, Chavez held himself out as an agent of AFLAC, and AFLAC viewed Chavez as its agent when he dealt with the BISD and its employees.

In fall 2001, the BISD issued a Request for Qualifications for a TPA to service its cafeteria plan. Chavez responded by

2

submitting an AFLAC proposal to the BISD's Insurance Committee to become the TPA for the plan. It appears that Chavez worried that, instead of AFLAC winning the TPA bid, a rival company, National Plan Administrators ("NPA"), would receive it. This motivated him to engage in numerous communications with Insurance Committee representatives. He also spoke at meetings of the BISD Board of Trustees to encourage them to select AFLAC. In response to Chavez's communications, BISD Superintendent Sauceda contacted AFLAC and stated that he would not permit it to submit a bid if Chavez remained the liaison to the BISD. Sauceda also informed Chavez that he was no longer allowed on BISD property. He cited unprofessional and unethical conduct on the part of Chavez. AFLAC had a different agent present its bid to the Insurance Committee, which it accepted by a vote of 44-1. Chavez contends that Sauceda's communications caused AFLAC to terminate him as a Regional Sales Coordinator.

## II. PROCEDURAL HISTORY

On May 31, 2002, Chavez filed a lawsuit in Texas state court against the BISD, Sauceda, and several school board members, alleging First Amendment free speech and Fourteenth Amendment due process violations. He also asserted Sauceda committed torts under state law. Defendants removed the case to federal district court. Chavez filed an amended complaint dropping claims against the board members on August 5, 2002. The BISD and Sauceda filed

Rule 12(b)(6) motions to dismiss. The district court granted Defendants' motions as to the due process claims on January 16, 2003. On September 25, 2003, the BISD and Sauceda filed separate motions for summary judgment as to all remaining claims. The district court granted the motions on January 7, 2004. On February 3, 2004, Chavez filed notice of appeal. The district court issued a memorandum opinion regarding its summary judgment on September 3, 2004.

### III. LEGAL STANDARDS

We review *de novo* Federal Rule of Civil Procedure 56 summary judgment motions, applying the same standards as the district court. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). All disputed facts are viewed in the light most favorable to the nonmovant. *Id.* The existence of a question of material fact precludes summary judgment. *Peel & Co. v. Rug Mkt.*, 238 F.3d 391, 394 (5th Cir. 2001). The movant has the burden of showing an absence of material fact by demonstrating that "the evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998).

We also review Federal Rule of Civil Procedure 12(b)(6) motions to dismiss for failure to state a claim *de novo*. *Gregson v. Zurich Am. Ins. Co.*, 322 F.3d 883, 885 (5th Cir. 2003). We view the defendant's 12(b)(6) motion with disfavor and construe

4

the plaintiff's complaint liberally in his favor.  *Id.*

## IV. <u>DISCUSSION</u>

Chavez argues that the district court erred (1) in granting the motions for summary judgment with regard to the First Amendment claims against the BISD and Sauceda; (2) in granting the motions to dismiss with regard to his due process claims; and (3) in granting the motion for summary judgment with regard to Chavez's state law claims.  We address these assertions in turn.

### A. Section 1983 First Amendment Retaliation

The district court found that Chavez failed to establish a fact issue as to the 42 U.S.C. § 1983 claims against the BISD and Sauceda because his speech in this case was not on a matter of public concern.  Alternatively, it ruled that the BISD could not be held liable for Sauceda's actions because Sauceda was not an authorized policymaker in this matter and no policy was established by the BISD with regard to Chavez.  We agree.

#### *1. Free Speech Retaliation Claim*

We must first determine whether we should view Chavez's relationship to the BISD as that of a private citizen or as that of an employee.  A different First Amendment analysis will be appropriate depending on Chavez's status.  *See Blackburn v. City of Marshall*, 42 F.3d 925, 931-32 (5th Cir. 1995). If Chavez was merely an ordinary citizen, we apply the standard set forth by the Supreme Court in *Perry v. Sindermann*, 408 U.S. 593 (1972); if

5

he was more like a public employee, we apply the test in *Pickering v. Board of Education*, 391 U.S. 563 (1968). *See id.* The district court concluded that Chavez was more akin to an employee and applied *Pickering*. We agree.

The Supreme Court has extended the application of *Pickering* to independent contractors. *See Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668 (1996); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996). And we have indicated that, when a public official terminates even a non-contractual, economic relationship with a service provider, *Pickering* should be applied so long as the speech at issue "relate[d] to the relationship from which [the plaintiff] was terminated." *Blackburn*, 42 F.3d at 934. In general, so long as there existed a relationship, "sufficiently 'analogous to an employment relationship,'" *Pickering* will apply. *Kinney v. Weaver*, 367 F.3d 337, 359 (5th Cir. 2004) (quoting *Blackburn*, 42 F.3d at 932). We find Chavez's relationship to the BISD to be sufficiently analogous to an employment relationship to warrant application of *Pickering*. *Cf. id.*, 367 F.3d at 357-61.

To establish his § 1983 free speech retaliation claim under *Pickering*, Chavez must show: (1) he suffered an adverse employment action; (2) his speech dealt with a matter of public concern; (3) his interest in his speech outweighs the government's interest in efficiency; and (4) his speech led to

6

the adverse employment action.  *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004).  The district court ruled that Chavez's speech was not on a matter of public concern and therefore not constitutionally protected.  We agree.

**Speech on a Public Concern**

"We have used two tests, sometimes in conjunction with one another, to determine whether speech relates to a public concern; both tests derive from language in *Connick v. Myers*, 461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983)."  *Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 366 (5th Cir. 2000).  *See also Daniels v. City of Arlington*, 246 F.3d 500, 503-04 (5th Cir. 2001) (discussing the two *Connick*-derived tests).  In one test, we examine "the content, form, and context of a given statement" to determine "[w]hether an employee's speech addresses a matter of public concern."  *Connick*, 461 U.S. at 147-48.  *See also Bradshaw v. Pittsburg Indep. Sch. Dist.*, 207 F.3d 814, 818 (5th Cir. 2000); *Teague v. City of Flower Mound*, 179 F.3d 377, 383 (5th Cir. 1999).  "The second, 'shorthand' test is the citizen-employee test."  *Kennedy*, 224 F.3d at 366.  It also comes from language in *Connick*:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

7

*Connick*, 461 U.S. at 147; *Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 563-64 (5th Cir. 2003). We determine whether the plaintiff "[spoke] primarily in his role as a citizen rather than as an employee addressing matters only of personal concern." *Fiesel v. Cherry*, 294 F.3d 664, 668 (5th Cir. 2002).

When an employee speaks purely on a matter of personal interest, clearly no constitutional protection attaches. *See Benningfield v. City of Houston*, 157 F.3d 369, 375 (5th Cir. 1998) ("[R]eview by a federal court is improper where the speech involves matters of solely personal interest."); *Wilson v. Univ. of Tex. Health Ctr.*, 973 F.2d 1263, 1269 (5th Cir. 1992) ("[The Supreme] Court removed from First Amendment protection only that speech that is made *only* as an employee, and left intact protection for speech that is made both as an employee and as a citizen."). However, in *Kennedy*, we signaled that we will easily find "mixed speech," *i.e.*, where "the employee . . . speaks from multiple motives." *See* 224 F.3d at 367. In *Teague*, a panel of this Circuit criticized earlier holdings indicating that so long as speech had a mixed quality it could receive constitutional protection: "The mere insertion of a scintilla of speech regarding a matter of public concern would make a federal case out of a wholly private matter fueled by private, non-public interests." 179 F.3d at 382. *Kennedy* questioned this position, noting that *Connick* only categorically denied First Amendment

8

protection to public employees speaking "'upon matters *only* of personal interest.'" 224 F.3d at 370 n.13 (quoting *Connick*, 461 U.S. at 417) (emphasis added in *Kennedy*). It thus appears that in the instant case, as in nearly all involving public employees, because at least a scintilla of public interest exists in such a dispute with public servants, the communications at issue must be treated as "mixed speech." *See Ayoub v. Tex. A & M Univ.*, 927 F.2d 834, 837 (5th Cir. 1991) (noting that "'almost anything that occurs within a public agency could be of concern to the public.'") (quoting *Terrell v. Univ. of Texas Sys. Police*, 792 F.2d 1360, 1362 (5th Cir. 1986)).

Mixed speech cases are often difficult. "The existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern." *Dodds v. Childers*, 933 F.2d 271, 273 (5th Cir. 1991). *See also Kinney*, 367 F.3d at 361 ("The weight of the First Amendment interest is, of course, not measured solely by the [speakers'] own personal gain, if any, from speaking."); *Thompson v. City of Starkville*, 901 F.2d 456, 463 (5th Cir. 1990) ("The existence of an element of personal interest on the part of an employee in his or her speech does not . . . dictate a finding that the employee's speech does not communicate on a matter of public concern."). "On the other hand, an employee cannot transform a personal conflict into an

issue of public concern simply by arguing that individual concerns might have been of interest to the public under different circumstances."  *Dodds*, 933 F.2d at 273.  *See also Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 341 (5th Cir. 2003) ("Speech that is primarily motivated by, or primarily addresses, the employee's own employment status rather than a matter of public concern does not give rise to a cause of action under § 1983.").  *But see Denton v. Morgan*, 136 F.3d 1038, 1043 (5th Cir. 1998) ("Neither the accuracy of the speech, nor the motivation of the speaker, plays a role in determining whether the expression involves a matter of public concern.").[1]

---

[1]In so far as *Denton* stands for the proposition that the speaker's motivation, *i.e.*, whether the speech is the result of a personal dispute or whether it arises out of civic concern, is always irrelevant to our First Amendment analysis, it is clearly an outlier in our jurisprudence.  *See Markos v. City of Atlanta*, 364 F.3d 567, 572 (5th Cir. 2004) (noting that the Fifth Circuit's precedent "support[s] the principle that an employee's motivation in speaking is relevant to the [First Amendment] inquiry at hand"); *Bradshaw*, 207 F.3d at 818 (finding speech unprotected because it was "more of an effort by Ms. Bradshaw to clear her name rather than some contribution to a public dialogue"); *Teague*, 179 F.3d at 383-84 ("Although interspersed with apparently genuine concerns regarding police wrongdoing, Teague's and Burkett's grievances were primarily motivated by, and primarily addressed, concerns particular to their private interests."); *Victor v. McElveen*, 150 F.3d 451, 456 (5th Cir. 1998) ("Victor spoke as a citizen on a matter of public concern, not as an employee upon matters only of personal interest.  At the time of his remarks, Victor was well pleased with his position as a courtroom bailiff; there was no evidence that he was a disgruntled employee or had any personal reason to protest what he perceived to be the potential racially discriminatory effects of the sheriff's approach to the new program." (citation omitted)); *Warnock v. Pecos County*, 116 F.3d 776, 780 (5th Cir. 1997) ("By reporting specific wrongs and abuses within the county

Armed with the two *Connick*-derived tests, some panels of this Circuit, ruling on mixed speech cases, have opted to focus on the content-form-context test and to perform the citizen-employee analysis in the alternative. *See, e.g.*, *Thompson*, 901 F.2d at 461-66. For instance, in *Teague*, we applied both tests,

---

government, Warnock was attempting to improve the quality of government. Her allegations hardly suggest a merely personal concern for her working conditions, job security, and the like."); *Forsyth v. City of Dallas*, 91 F.3d 769, 773 (5th Cir. 1996) ("Further, it does not appear that [plaintiffs] were primarily motivated by personal and not public concerns in publicizing their allegations."); *Caine v. Hardy*, 943 F.2d 1406, 1416 (5th Cir. 1991) ("Dr. Caine did not object to the award of an exclusive anesthesia contract solely, or even primarily, because of his concern as a citizen for the sound management of his local hospital."); *Dorsett v. Bd. of Trs. for State Colleges & Univs.*, 940 F.2d 121, 124 (5th Cir. 1991) ("We must assess, therefore, Dorsett's primary motivation in complaining to the administration."); *Dodds*, 933 F.2d at 273 ("The court may therefore be required to assess the primary motivation of the speaker in evaluating whether her speech addresses a matter of public concern."); *Gomez v. Tex. Dep't of Mental Health & Mental Retardation*, 794 F.2d 1018, 1021 (5th Cir. 1986) ("Plainly, Gomez' purpose in relating the information was to advise the employee of expected reductions in the length of time patients would remain at the State Center and to warn of the additional burden the change would place on Gomez' interlocutor and on the County Center generally."); *Day v. South Park Indep. Sch. Dist.*, 768 F.2d 696, 700 (5th Cir. 1985) ("The district court correctly concluded that Day's complaint was 'purely a private matter.' She was primarily concerned about her principal's negative evaluation of her performance and his failure to explain her evaluation to her satisfaction."). Such a position strikes at the heart of the citizen-employee test as courts could not inquire into whether the employee was speaking in his role as a citizen or as an employee. Indeed, *Gonzalez v. Benavides*, the case cited by *Denton* for this proposition, merely argues for the existence of speech with "'mixed' issues of both public and private concern." 774 F.2d 1295, 1301 (5th Cir. 1985). And we have never cited *Denton* to support the position that the reasons for the plaintiff's speech are entirely unimportant.

noting that "more often than not the 'citizen versus employee' test will point us in the right direction, and so we consider it here, in conjunction with the more lengthy three-factor balancing test . . . ." 179 F.3d at 382. The content of the speech in *Teague* was "predominantly public," but the form and context were private. *See id.* at 383. Thus, we concluded that the statements at issue were "primar[il]y of private concern." *Id.* We then also applied the "'citizen versus employ[ee]'" test and reached the same conclusion. *See id.* Similarly, in *Kennedy*, though we indicated that "we [were] not obligated to apply the citizen-employee test in mixed speech cases," we still did so and, as in *Teague*, observed that we reached the same conclusion. *See* 224 F.3d at 375-76.

Other panels have incorporated the citizen-employee test into the content discussion of the content-form-context test. Generally, courts view content abstractly to determine whether it is of legitimate interest to an informed citizenry. *See, e.g.*, *Davis v. Ector County*, 40 F.3d 777, 783 (5th Cir. 1994) ("'Reports of sexual harassment perpetrated' on public employees is of serious public import. The fact that he also sought to strengthen the credibility of his wife does nothing to dilute the *public interest inherent* in the letter's contents.") (emphasis added); *Moore v. City of Kilgore*, 877 F.2d 364, 370 (5th Cir. 1989) ("If staffing shortages potentially threaten the ability of

the Fire Department to perform its duties, people in the community want to receive such information. The public had an interest in hearing the content of Moore's speech."). However, in some opinions, we have focused on the personal interest the speaker held in his speech's content. This methodology may reflect the Supreme Court's implicit admonition in *Connick* that matters of public concern are generally "not tied to a personal employment dispute." 461 U.S. at 148 n.8. *See, e.g.*, *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 222 (5th Cir. 1999) (noting that the plaintiffs' general (and legitimately public) interest in an "improvement of the educational environment" at their school differs critically from quintessentially personal interests, such as "an underlying personal dispute" or "an employment related squabble with [a] supervisor."). *But see Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1051 (5th Cir. 1996) (commenting "that speech made in the role as employee is of public concern . . . in limited cases: those involving the report of corruption or wrongdoing to higher authorities").

In *Markos*, we looked at issues of personal interest, *i.e.*, the speaker's motivation, within the "content" portion of the first test. *See* 364 F.3d at 571. Specifically, we noted that "[s]tatements made to exonerate one's own professional reputation address a matter of personal concern." *Id.* However, "speech on behalf of a coworker" was public in nature. *Id.* This

13

distinction appears to be based purely on the speaker's interests, not society's.[2]

Similarly, in *Dodds*, a panel of this circuit appeared to inject the citizen-employee test into the content portion of the content-form-context analysis. *See* 933 F.2d at 274. The case involved speech by a community college employee who alleged that one of her colleagues received special treatment because of a familial relationship with the president of the college's board of trustees. *See id.* at 272. The opinion set forth the citizen-employee test, *id.* at 273, and recognized that because of the public interests implicated by the speech, "nepotism, favoritism, and misallocation of public funds," this was indeed a case of mixed speech. *Id.* at 274. However, it found that the plaintiff did not speak predominantly as a citizen:

> Dodds's comments indicate her primary concern as the effect of the favoritism shown to Bolden on her own employment, not its potential effect on the public interest. . . . Her protest about not creating jobs "based on personal gain and political expediency" arose in reference to her fear that Bolden was being groomed to take her job. . . . While she may have privately considered creating a program for Bolden to be a misuse of public funds, she expressed this belief only after filing suit.

*Id.* Again, *Dodds* focuses on the plaintiff's interest in her

---

[2]*Markos* did separately examine the plaintiff's motivations outside of the realm of content, though. *See* 364 F.3d at 572-74. Indeed, it viewed them as separate inquiries: "In this case, the fact that the content of the speech *and* Markos' motivations were partially private is not enough to remove this speech from the realm of public concern." *Id.* at 574 (emphasis added).

14

speech's content.  In this way, it seems the panel in *Dodds*
merged the citizen-employee test with the content portion of the
content-form-context test.  *See also Dorsett*, 940 F.2d at 124-25
(discerning plaintiff's "primary motivation" through examining
the content of his speech, in addition to other evidence, and
then analyzing separately the speech's form and context).  *But
see Moore*, 877 F.2d at 371-72 (examining plaintiff's motivations
during form analysis).

A third approach taken by panels of the Fifth Circuit is to
focus on "the hat worn by the employee," the citizen-employee
test, and to look at content, context, or form only to assist in
that endeavor.  *Gillum v. City of Kerrville*, 3 F.3d 117, 121 (5th
Cir. 1993).  Although the plaintiff in *Gillum* spoke on issues of
"corruption in an internal affairs department" of a police
department–"a matter of public concern" "to be sure"–we did not
find public speech because "Gillum's focus was . . . on this
issue only insofar as it impacted his wish to continue his
investigation."  *Id.*  In addition to the public content of the
speech, we also noted its essentially private form.  *Id.*  *See
also Caine*, 943 F.2d at 1416 (finding dispositive, in a case of
speech with arguably public context and content and private form,
that "Dr. Caine did not object to the award of an exclusive
anesthesia contract solely, or even primarily, because of his
concern as a citizen for the sound management of his local

15

hospital.  Rather, his objections stemmed from his perfectly normal, but private interest as a hospital staff member that his job be as remunerative as possible.").

As this discussion shows, no single approach to determining the existence of speech on a public concern predominates in the Fifth Circuit.  Indeed, other panels of this Court have noted the lack of precision inherent in such a fact-intensive and holistic analysis.  *See Thompson*, 901 F.2d at 461 (noting that "the definition of the term 'public concern' is far from clear-cut"); *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 798 (5th Cir. 1989) ("The definition of 'matters of public concern['] is imprecise.").[3]  Ever mindful of *Connick*'s core principles, in

---

[3]This is most likely why some panels have found it useful to assemble the various factual scenarios that have or have not led courts to find protected speech.  We did so in *Kirkland*:

> [P]rotesting the President's policies by commenting favorably upon an assassination attempt against his life is a matter of "public concern" meriting protection. Similarly, a public school teacher may publicly protest the school board's allocation of resources between athletics and academics, or a school's alleged racially discriminatory policy in a private conversation with the principal, without suffering retaliatory dismissal.  We have held that public employees raise matters of public concern if they criticize the special attention paid by the police to a wealthy neighborhood, or the implementation of a federally funded reading program. Moreover, the quality of nursing care given to a group of people, including inmates, is a matter of public concern, as is the adequacy of a fire department's level of manpower.  However, public employees raise matters of "private concern" if they criticize the morale problems or transfer policies at the district attorney's office; or criticize the performance of co-employees and supervisors; or protest an employer's unfavorable job

16

this case, we think the best approach is to apply all three forms of analysis in conjunction to ensure that we come to the clearest constitutional understanding of Chavez's speech.

The district court identified seven instances of speech by Chavez: (1) November 9, 2001, Memorandum to Insurance Committee Campus Representative; (2) November 12, 2001, Memorandum to Insurance Committee Campus Representative; (3) November 19, 2001, Memorandum to Insurance Committee Campus Representative; (4) "Corrected Cafeteria Plan Comparison Chart"; (5) "Why AFLAC?" Flyer; (6) November 13, 2001, BISD meeting; (7) November 20, 2001, BISD meeting.  We review each.

**(1) November 9, 2001, Memorandum**

The memorandum was faxed by Chavez to insurance committee

---

evaluation.

890 F.2d at 798 n.10 (citations omitted).  This was also our approach in *Kennedy*:

> Having thus canvassed our mixed speech precedent, we discern three reliable principles.  First, the content of the speech may relate to the public concern if it does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government.  If releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature.  Second, speech need not be made to the public, but it may relate to the public concern if it is made against the backdrop of public debate.  And third, the speech cannot be made in furtherance of a personal employer-employee dispute if it is to relate to the public concern.

224 F.3d at 372 (citations omitted).  We find such distillations of this Circuit's holdings helpful in our analysis, as well.

representatives who were, in turn, encouraged to distribute it to other BISD employees. It concerned a "change in the group health coverage" for BISD employees. In doing so it accused "[s]ome of [the] elected board members and hired administrators" of attempting to make a decision harmful to the employees' interests and even implied that they may have misrepresented AFLAC's services. The stated purpose of the memorandum was "to set the record straight directly with the people who should have control over the say so of employee benefits - employees." It went on to detail the benefits of AFLAC.

Under both the citizen-employee and content-form-context tests, this instance of speech is easily characterized as private and undeserving of constitutional protection. The notion that by writing this memorandum Chavez was acting any differently than "an employee embroiled in a personal employment dispute" need not be seriously debated. *Gillum*, 3 F.3d at 121. Clearly, his sole purpose was to preserve AFLAC's business relationship with BISD employees. Chavez cannot reasonably argue that he spoke predominantly as a citizen. *See Dodds*, 933 F.2d at 274.

The content of the communication is also largely private. A view of content that looks at the speaker's interest in his own speech shows that Chavez's concern was predominately private. *See Dorsett*, 940 F.2d at 124 ("Dorsett's complaints at the time of the alleged harassment reflected predominantly his concerns

18

about the assignment of summer and overload classes to himself and to his friends in the department. These concerns are matters of private, not public, interest.") *See also Markos*, 364 F.3d at 571 ("Statements made to exonerate one's own professional reputation address a matter of personal concern.") Even a purely abstract inquiry into the community's interest in this speech yields results unfavorable to Chavez. Because of its distribution to public employees this matter could be of interest to members of the community. *See Terrell*, 792 F.2d at 1362. However, Chavez cannot reasonably contend that its contents are "of great consequence to the public," *Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2001), or that "the information conveyed is of 'relevance to the public's evaluation of the performance of governmental agencies.'" *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991) (*quoting Day*, 768 F.2d at 700). And, contrary to Chavez's assertions, the memorandum never accuses public officials of corruption or misdeeds. *Cf. Denton*, 136 F.3d at 1043 ("[S]peech reporting official misconduct, wrongdoing, or malfeasance on the part of public officials involves matters of public concern.").

The form and context of Chavez's speech are even more clearly private in nature. The form of this speech was private as the memorandum was only distributed to BISD employees. *See Alexander*, 392 F.3d at 143 ("The form of these questions was

19

clearly private, as they were not leaked to a reporter or sent to an elected state official."). Furthermore, Chavez signed the memorandum as "Regional Sales Coordinator" and typed it on AFLAC letterhead. *See Bradshaw*, 207 F.3d at 817 ("The form of the memoranda provides further support that Bradshaw drafted the documents in her capacity as a public employee rather than as a public citizen. Each of them was signed by Bradshaw as 'High School Principal.' At least two of the memoranda were on Pittsburg High School Letterhead."). Finally, the speech was not "made against the backdrop of ongoing commentary and debate in the press." *Kennedy*, 224 F.3d at 373. *See also Gomez*, 794 F.2d at 1021 (finding that ongoing discussions among the "employees of the agencies involved" does not mean something is "a matter of public debate"). Thus, the context of the speech was also private.

The memorandum of November 9, 2001, is therefore unprotected speech.

**(2) November 12, 2001, Memorandum**

This memorandum simply updates the previous one. It informed insurance committee representatives that any decision on this issue had been postponed and worried that "employees will be forced to make cafeteria plan decisions with little or no notice." For the purposes of our analysis, it does not differ materially from the first memorandum. Thus, for the reasons

20

discuss *supra*, it is not entitled to constitutional protection.

### (3) November 19, 2001, Memorandum

The November 19, 2001, memorandum does not differ materially from that of November 9, 2001. The only difference is that it informs insurance committee representatives that it has been recommended to the school board that NPA become the TPA and this is "definitely not . . . in the best interest of employees." It then discusses the advantages of AFLAC over NPA, lifting most of the text verbatim from the first memorandum. Again, for the reasons that memorandum was not speech on a public concern, this memorandum is not either.

### (4) "Corrected Cafeteria Plan Comparison Chart"

The corrected cafeteria plan comparison chart was attached to the November 9, 2001, memorandum. It is a chart of unknown origins, discussing AFLAC's services. It was originally distributed to BISD employees, unbeknownst to Chavez. On the copy circulated, Chavez penciled in corrections to the information presented. In most instances he indicated that services the chart claimed AFLAC charged for are in fact free. Chavez also stated explicitly on the copy: "There are no fees associated with AFLAC's cafeteria plan services. BISD does not pay a fee. Employees do not pay a fee." The chart corrections suffer the same constitutional infirmities as the memoranda–Chavez wrote and distributed the chart as an AFLAC

21

salesman, not as a citizen, and the content, form, and context (which are essentially the same as the memoranda) show this document to be a private, constitutionally-unprotected communication.

**(5) "Why AFLAC?" Flyer**

Chavez typed the "Why AFLAC?" flyer and distributed it at meetings of the Board of Trustees. The one-page flyer consists of five numbered paragraphs. Four of the paragraphs have content similar to the memoranda. They extol AFLAC's quality of service, low cost, flexibility, and in-person, local contact. This content is not a public concern for the reasons the memoranda's is not. The other paragraph is not as obviously private in nature. It reads:

> According to the Texas Attorney General's Office in their [sic] legal opinions dated May 8, 1987 and April 4, 2000, granting an agent of record designation to an insurance agent or agency is illegal when the value of the contract is more than $10,000. Moreover, granting an individual an agent of record letter for the purpose of soliciting optional retirement investments or annuities is also illegal. Approving agenda Item #24 that reads, "Recommend approval to award RFQ#012-02 to National Plan Administrators / Insurance Associates of the Valley..." would be illegal as there [sic] proposal calls for an agent of record designation.

Assuming for the purposes of this analysis Chavez's statement is correct, we find that it alone does not elevate the flyer to the status of speech on a public concern.

The citizen-employee test yields the same results it did above. Chavez is speaking as an insurance representative trying

22

to win business for AFLAC–hence, the title of the title of the flyer, "Why AFLAC?," and the other four paragraphs. We dealt with a similar situation in *Knowlton v. Greenwood Independent School District*. 957 F.2d 1172 (5th Cir. 1992). The speech by school district employees included allegations of a Fair Labor Standards Act (FLSA) violation, being made to work without pay. *See id.* at 1178. We found this was insufficient to make the speech's content a public concern: "The record reflects that the workers' concern was the effect of the meal program on their employment and personal lives, rather than public interest in FLSA violations. They did object to working without pay; but equal, if not greater, concerns arose from interference with family life . . . ." *Id.* Similarly, Chavez's primary concern was being able to sell AFLAC, not the BISD's compliance with legal memoranda generated by the Texas AG's office. Chavez was speaking as an AFLAC sales representative, not as a citizen.

An application of the content-form-context test does not persuade us that the result of the citizen-employee test is incorrect. A content analysis that incorporates the citizen-employee test shows that Chavez's words were calculated to secure business for AFLAC, not to ensure compliance with Texas law. That he found new additional reasons for why the company he represented should receive the business cannot transform a wholly private interest into a public one. *See Bradshaw*, 207 F.3d at

23

817 ("Bradshaw is not entitled to insert a few references to an activity fund and claim that her speech was primarily that of a citizen rather than a disgruntled employee.") *See also Davis v. W. Cmty. Hosp.*, 755 F.2d 455, 462 (5th Cir. 1985) ("[N]o particular statement touching upon a matter of potential public concern must be treated separately out of context and thereby given first amendment protection."). We acknowledge that an abstract view of the content does show the speech to be of interest to the public. However, we find that this is trumped by the private form and context of the speech. *See Teague*, 179 F.3d at 383. Chavez did not seek to distribute this flyer to the press or the citizenry at large outside of the school district. *See Dodds*, 933 F.2d at 274 ("Dodds did not address her complaints to anyone outside the College . . . ."). Even though it is possible that members of the public could have been at the meetings where the flyer was distributed, any publicization was incidental. Nor was the speech "made against a backdrop of widespread debate in the . . . community." *Tompkins v. Vickers*, 26 F.3d 603, 607 (5th Cir. 1994).

Thus, we find Chavez's flyer to be predominantly private and not meriting constitutional protection.

**(6) November 13, 2001, BISD Board of Trustees Meeting**

Chavez spoke about this issue during the public comments portion of the Board of Trustees meeting on November 13, 2001.

24

Chavez introduced himself as a citizen and as a taxpayer. The general thrust of his speech is difficult to decipher. It seems that he was upset at the members of the Board for their "extreme politics" regarding the Cafeteria Plan, although he stated that he really did not know what was going on. And he urged the head of the insurance committee to come to a decision soon regarding the plan. In general, it seems like he was trying to complain about the process of selecting the Cafeteria Plan administrator.

For the same reasons we did not find speech on a public concern in the prior instances, we find this speech to be predominantly private. Under the citizen-employee test, Chavez spoke primarily as an AFLAC representative—in this case, a clearly aggrieved one. *Terrell*, 792 F.2d at 1363 ("Terrell was not terminated for speaking 'as a citizen upon matters of public concern[,]' *Connick*, 103 S. Ct. at 1690, or for 'speak[ing] out as a citizen on a matter of general concern, *not tied to a personal employment dispute*,' *id.* at 1691 n.8 (emphasis added)."). He cannot simply introduce himself as a citizen in order to transform his complaints about the BISD's treatment of AFLAC into a public concern. Any allusions to the behavior of public officials in Chavez's speech were limited to its impact on AFLAC's sales. *See Gillum,* 3 F.3d at 121 ("To be sure, corruption in an internal affairs department is a matter of public concern. Gillum's focus was, however, on this issue only

25

insofar as it impacted his wish to continue his investigation."). The district court described Chavez's speech as "akin to the ranting of a disgruntled employee attempting to draw attention to his proposal because he believes his proposal offers employees the best option."  We agree with this characterization.

The content-form-context test buttresses this conclusion.  A view of content weighing the speaker's personal interests leads to a conclusion that the content is predominantly private. Chavez's concern about the Board's dealings was limited to his ability to sell AFLAC's product.  *See Bradshaw*, 207 F.3d at 817 ("Although partially about the fund, which may be a matter with some public concern, plaintiff wrote the memoranda, investigated the fund and chastised Board members in an effort to protect her name and her job.").  Admittedly, though, an abstract view of Chavez's speech does lead us to conclude that citizens would find it interesting.  Outweighing this factor is the largely private nature of the form and context.  As noted *supra*, although his comments could have been heard by members of the public, Chavez addressed the Board as the gatekeeper to his customers, not as elected public servants, and any information those outside of the BISD would have gleaned from his statements was purely incidental.  Additionally, there is no evidence of any ongoing public debate on this issue.

When viewing the "record as a whole," we reach the same

26

conclusion as the district court-Chavez's speech at the Board meeting does not qualify as speech on a public concern. *Stewart v. Parish of Jefferson*, 951 F.2d 681, 683 (5th Cir. 1992).

**(7) November 20, 2001, BISD Board of Trustees Meeting**

Chavez again spoke during the public comments portion of a meeting of the BISD Board of Trustees. He introduced himself as an AFLAC representative: "Board members, my name is Dino Chavez, I represent AFLAC. . . . I'm here tonight to explain to you five reasons why you should choose AFLAC." Chavez then provided the same five reasons contained in the "Why AFLAC?" flyer discussed *supra*: legality, low cost, flexibility, service and personal contact with local representatives. The only portion of Chavez's speech that merits our attention is his statement about the legality of selecting NPA as the Agent of Record: "Legality, which is the most important one. I'm not an attorney, and I don't claim to be, but according to the Texas Attorney General's Office in their [sic] legal opinions dated May 8th, 1987 and April 4th, 2000, Granting an Agent of Record designation to an insurance agent or agency is illegal . . . ."

For the same reasons the "Why AFLAC?" flyer was not an instance of public speech, neither was Chavez's nearly identical testimony. The citizen-employee test is even easier as Chavez identified himself as "an AFLAC representative" and, again, provided the reason for his speech: "why you should choose

27

AFLAC." The central interest that Chavez expressly implicates in his speech is that of his potential BISD customers to get the best deal on personal insurance. This is private in orientation and supports the contention that he was speaking predominantly as an AFLAC representative, not as a concerned citizen. The content-form-context test does not seriously undermine this conclusion. The subjective content examination shows that Chavez's interest in his speech was predominantly, if not purely, personal. And, while we concede that some of the information contained in his speech, when viewed abstractly, is of public concern, the form and context were predominantly private, for the reasons stated *supra*. We also emphasize that, at the meeting, Chavez did not allege any corruption or malfeasance on the part of public officials. *Cf. Brawner v. City of Richardson*, 855 F.2d 187, 191-92 (5th Cir. 1988) ("The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection . . . .").

Thus, we conclude that Chavez has not shown that he engaged in speech on a public concern. We agree with the district court's conclusions and affirm its summary judgment with regard to his § 1983 lawsuit against Sauceda and the BISD.

### 2. Liability of the BISD

We also agree with the district court's conclusion that Chavez did not create a fact issue as to the BISD's liability,

even if he had shown that Sauceda violated his rights.  Section 1983 allows for recovery from the BISD, Sauceda's employer, if Chavez's alleged injuries occurred "under color of any statute, ordinance, regulation, custom or usage" of the school district. 42 U.S.C. § 1983.  Since Chavez does not point to an offending statute or regulation, he must show that a policy or practice of the BISD caused his alleged injury.  *See Foust v. McNeill (In re Foust)*, 310 F.3d 849, 861 (5th Cir. 2002).  "To establish liability for a policy or practice, a plaintiff must prove that (1) the local government or official promulgated a policy; (2) the decision displayed 'deliberate indifference' and proved the government's culpability; and (3) the policy decision lead to the particular injury."  *Id.*

We have set forth what constitutes an "official policy" under § 1983 for the purposes of municipal liability:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.

*Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (en banc) (per curiam), *cert. denied*, 472 U.S. 1016, 105 S. Ct. 3476, 87 L. Ed. 2d 612 (1985).  *Accord Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir.

29

2004); *Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 289 (5th Cir. 2002). It is clear here that Sauceda's action is best characterized as a single decision, rather than as a regulation, policy statement, ordinance, or widespread practice. For an isolated decision to constitute a policy for the purposes of § 1983, we require a plaintiff to show that "the decision was made by an authorized policymaker in whom final authority rested regarding the action ordered." *Cozzo*, 279 F.3d at 289. *See also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("We have assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business.").

Naturally, based on the facts presented in this case, Chavez could meet his burden on the policy prong by showing that Sauceda was the policymaker with final authority in this matter. Conversely, if final policymaking authority rested not with Sauceda, but with the BISD Board of Trustees, Chavez could establish municipal liability if the Board officially ratified or granted it imprimatur to Sauceda's decision. *See Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

**Sauceda as Policymaker**

The district court found that Chavez failed to present evidence showing that Sauceda held policymaking authority in this

matter.  We agree.

Our opinion in *Jett v. Dallas Independent School District* established that the Board of Trustees of a Texas independent school district holds sole policymaking authority for the district.  7 F.3d 1241 (5th Cir. 1993).  We stated:

> [F]inal policymaking authority in an independent school district . . . rests with the district's board of trustees.  Texas Education Code § 23.01 provides that "The public schools of an independent school district shall be under the control and management of a board of seven trustees."  The Education Code further provides that "the trustees shall have the *exclusive* power to manage and govern the public free schools of the district," *id.* § 23.26(b) (emphasis added), and that "the trustees may adopt such rules, regulations, and by-laws as they may deem proper."  *Id.* § 23.26(d).  Nothing in the Texas Education Code purports to give the Superintendent any policymaking authority or the power to make rules or regulations . . . .

7 F.3d at 1245.[4]  Chavez responds that the BISD Board of Trustees delegated to the superintendent the authority to make unilateral decisions regarding the hiring or termination of the TPA.

Indeed, in this case, as in *Jett*, the Board did delegate decision-making power to the district superintendent.  However, there exists a meaningful distinction between policymaking and decision making.  *See* 7 3d. at 1246 (noting that simply because the superintendent "may have been delegated the final decision in the cases of protested individual employee transfers does not

---

[4]The Texas Education Code has since been amended.  However, for our purposes, these changes do not alter *Jett*'s conclusions regarding the authority of superintendents under Texas law.

31

mean that he had or had been delegated the status of policymaker, much less final policymaker, respecting employee transfers"). *See also Praprotnik*, 485 U.S. at 129-30 ("'[I]f [city] employment policy was set by the [Mayor and Aldermen and by the Civil Service Commission], only [those] bod[ies'] decisions would provide a basis for [city] liability. This would be true even if the [Mayor and Aldermen and the Commission] left the [appointing authorities] discretion to hire and fire employees and [they] exercised that discretion in an unconstitutional manner . . . .' [*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 n.12 (1986).]"). Granting Sauceda the authority to make individual personnel decisions simply does not constitute an assignment of policymaking power.

**The BISD Board of Trustees**

Alternatively, Chavez tried to show that the BISD Board of Trustees, as the district's policymaker, "intentionally deprived [him] of a federally protected right." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997). Chavez argues that the Board in effect "adopted or approved" Sauceda's decision and thereby became the constitutional violator. We agree with the district court that this theory is wholly unsupported by the record.

Chavez is unable to show that a policy or practice of the BISD caused his alleged injuries. Therefore, we affirm the district court's summary judgment in favor of the BISD.

32

## B. Due Process Claim

In Chavez's first amended complaint, he asserted claims against the BISD and Sauceda for violation of his Fourteenth Amendment due process rights under § 1983. The district court granted Defendants' 12(b)(6) motions to dismiss for failure to state a claim. After noting that property interests are created by state law, it ruled that no such interest existed with regards to Chavez's desire to be AFLAC's agent to the BISD: "Plaintiff does not cite to any Texas cases, nor has the Court unearthed any, in which the courts recognized a property interest in the award of a government contract. To the contrary, case law indicates that . . . a rejected bidder has no property right in the award of the contract." The district court concluded:

> Plaintiff cannot establish a property interest because his interest in the proposal itself is simply too attenuated. Plaintiff was an employee of AFLAC. He was not an independent contractor and received no direct payment or formal benefits from BISD . . . . Despite the fact that Plaintiff had previously administered the insurance policy plans for BISD employees, he had no more than a "unilateral expectation" that he could continue to submit proposals and serve BISD employees.

As we recognized in *Blackburn*, a plaintiff like Chavez must identify the independent source of his alleged property interest. *See* 42 F.3d at 936-37 ("Property interests are not created by the Constitution; rather, they stem from independent sources such as state statutes, local ordinances, existing rules, contractual provisions, or mutually explicit understandings."). Like the

33

plaintiff in *Blackburn*, Chavez has failed to cite any legal ruling or statute in Texas entitling him to the government benefit, in this case the opportunity to present an insurance bid to the BISD. *See id.* at 937 ("[Plaintiff] cites, and we have found, no decision of any Texas court indicating that he had any entitlement to be or remain on the on-call rotation list. Nor does he cite . . . any Texas statute or administrative regulation, or any ordinance . . . , which might be construed to provide such an entitlement.").

Thus, we affirm the district court's dismissal of Chavez's due process claim.

## C. State Law Claims

The district court granted summary judgment for Sauceda on Chavez's state law claims for tortious and intentional interference with a business relationship, malice, fraud, libel and slander, and intentional infliction of emotional distress, because of Texas Education Code § 22.051's grant of professional immunity. The statutory provision clearly grants immunity to superintendents. *See* TEX. ED. CODE § 22.051. However, it only applies to school employees acting in the scope of their employment. *See Gonzalez v. Ison-Newsome*, 68 S.W.3d 2, 5 (Tex. Ct. App. 1999). Specifically, Sauceda and other defendants asserting this defense must prove the following: "(1) they were professional school employees, (2) acting incident to or within

34

the scope of their duties, (3) the complained-of action involved the exercise of judgment or discretion on their part, and (4) did not involve the discipline of a student." *Id.*

Naturally, the first and fourth parts are not in dispute. As to the second prong, it is hard to imagine that one could seriously argue Sauceda's actions with regard to Chavez were not at least incident to his duties. "Whether one is acting within the scope of his employment depends upon whether the general act from which injury arose was in furtherance of the employer's business and for the accomplishment of the object for which the employee was employed." *Chesshir v. Sharp*, 19 S.W.3d 502, 504 (Tex. Ct. App. 2000). School superintendents are required to "manag[e] the day-to-day operations of the district as its administrative manger." TEX. EDUC. CODE § 11.201(d)(5). Clearly, Sauceda was managing the District's operations by dealing with the cafeteria plan. And his actions with regard to Chavez were incident to that administrative duty.

Likewise, Sauceda's actions in this matter cannot reasonably be considered ministerial, instead of discretionary. *Downing v. Brown*, 935 S.W.2d 112, 114 (Tex. 1996) ("Ministerial actions require obedience to orders or the performance of a duty to which the actor has no choice. On the other hand, if an action involves personal deliberation, decision and judgment, it is discretionary." (citations omitted)). It is virtually axiomatic

35

that "[t]ermination and contract renewal decisions and employee evaluations are duties that require the exercise of a school supervisor's judgment and discretion." *Carey v. Aldine Indep. Sch. Dist.*, 996 F. Supp. 641, 656 (S.D. Tex. 1998).

Thus, we affirm the district court's grant of summary judgment for Sauceda on the state law claims.

## V. <u>CONCLUSION</u>

For the foregoing reasons, we AFFIRM.