# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 27, 2007

Charles R. Fulbruge III
Clerk

No. 06-50305

---

PHILIP L. STOTTER, PH.D

Plaintiff-Appellant

v.

UNIVERSITY OF TEXAS AT SAN ANTONIO, GUY BAILEY, DAVID
JOHNSON

Defendants - Appellees

_____

PHILIP L. STOTTER, PH.D

Plaintiff-Appellant

v.

UNIVERSITY OF TEXAS AT SAN ANTONIO, THE BOARD OF REGENTS,
RICHARD ROMO, GUY BAILEY

Defendants - Appellees

---

Appeal from the United States District Court
for the Western District of Texas

---

## ON PETITION FOR PANEL REHEARING

Before DENNIS, PRADO, Circuit Judges, and ENGELHARDT, District Judge.[*]

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

DENNIS, Circuit Judge:

This case involves the termination of an employment contract of a tenured professor, Philip L. Stotter, Ph.D, at the University of Texas at San Antonio ("UTSA") and the alleged destruction of his personal property. UTSA terminated its contract with Dr. Stotter because of his alleged repeated refusal to improve the conditions of his lab and office, both of which allegedly posed serious health and safety hazards. Upon remedying these issues, UTSA allegedly discarded several pieces of personal property belonging to Dr. Stotter without giving him sufficient opportunity to retrieve them. Dr. Stotter filed a § 1983 procedural due process claim against UTSA, Dr. Guy Bailey, and Dr. David Johnson; and equal protection and First Amendment claims against UTSA, the Board of Regents, Dr. Bailey, and Dr. Richard Romo. The district court granted summary judgment in favor of the defendants. On November 5, 2007, we affirmed, in part, reversed, in part, and remanded this case to the district court for proceedings consistent with that opinion. On November 19, 2007, UTSA filed a motion for panel rehearing. We hereby GRANT the motion, VACATE the prior panel opinion, and SUBSTITUTE this opinion in its place.

## I. BACKGROUND

Philip L. Stotter, Ph.D, had been a tenured professor in the Department of Chemistry at UTSA since 1974. UTSA provided him with a lab and an office to perform research, teach students, meet with colleagues, and otherwise perform the normal functions of being a faculty member.

In December of 1998 and January of 1999, UTSA inspected several labs in the Chemistry Department due to reports of potential health and safety hazards and, according to Dr. Stotter, the possibility of "drug-making activity" associated with the lab of a colleague, Dr. Budalur Thayagarajan. Richard Garza, a UTSA employee, informed Dr. Weldon Hammond, the Director of Earth and Physical Sciences and supervisor of the Department of Chemistry, that the

labs of Drs. Thayagarajan and Stotter needed immediate attention. Dr. Thayagarajan's lab was in need of an emergency eye wash station and proper storage containers and two refrigerators required cleaning. Dr. Stotter's lab lacked personal protective equipment and proper storage containers and one refrigerator required cleaning. According to UTSA, Dr. Stotter was verbally notified that these deficiencies needed to be corrected.

On February 16, 1999, according to Dr. Stotter, UTSA determined that Dr. Thayagarajan's lab had "big" problems. Several unidentified chemicals required special handling, some of which were toxic, and two refrigerators were in need of decontamination. In May and June of 1999, according to Dr. Stotter, UTSA determined that the lab might also contain TNT and old ethers and that a bomb squad might have to remove these hazards. UTSA eventually contracted with a company to clean the lab.

In December of 1999, UTSA conducted routine inspections of the faculty offices and determined that Dr. Stotter's office was an "extreme fire hazard" due to papers, trash, and boxes. Dr. Stotter alleges that he was not present for this inspection, did not receive a copy of the report, and was not requested to take any action. According to UTSA, he was verbally notified to clean his office.

In March of 2000, UTSA again inspected Dr. Stotter's lab and determined that some problems still needed attention. Dr. Stotter alleges that he was not present for this inspection and did not receive a copy of the report until October or November of 2000. It was later discovered that the report was emailed to Dr. Stotter, but he was not using the UTSA email system at the time.

In the summer of 2000, Dr. Stotter accepted a summer appointment at Los Alamos National Laboratory in New Mexico. During that time, he closed his lab. On August 14, 2000, while in New Mexico, Dr. Stotter sent a memo to UTSA officials and members of the faculty addressing an ongoing dispute regarding his

medical leave during 1989-1991 and through 1993. At one point in his memo, he referred to an "administrative misuse of [his] benefits at UTSA."

In October of 2000, UTSA again inspected Dr. Stotter's office and determined that problems still existed. Dr. Hammond sent Dr. Stotter an email requesting that he correct the situation as soon as possible. Due to health issues, Dr. Stotter was given until November 10, 2000 to clean his office. On October 31, 2000, UTSA also advised Dr. Stotter that he needed to address the issues regarding his lab to avoid closure. Plans to clean his office subsequently fell through. On December 18, 2000, UTSA conducted additional inspections of the labs and found that several labs, including Dr. Stotter's, still had problems. Dr. Stotter alleges he did not receive this report until January 8, 2001.

On January 2, 2001, Dr. Hammond sent Dr. Stotter two letters indicating that he had violated UTSA's health and safety regulations, that he had been notified several times about these violations, and that UTSA intended to remedy the situation with his office on January 8, 2001. The second letter indicated that Provost Dr. Guy Bailey had been notified and was now involved. Dr. Stotter responded with a letter to Dr. Hammond, Dr. Bailey, and UTSA President Dr. Ricardo Romo, detailing his efforts to address these problems. He indicated that he had met with a safety officer about removing the chemicals from his lab and that several colleagues and students were going to help him clean his office sometime in the first week of January. By the end of the first week of January, however, the office had not yet been cleaned, and on January 8, 2001, UTSA proceeded with its plans to clean it. Dr. Stotter tried to halt the cleanup effort and caused such a disturbance that UTSA police handcuffed him, took him to his car, and advised him to leave the premises.

On January 12, 2001, Dr. Romo sent a letter to Dr. Stotter informing him that he was being suspended with pay pending an investigation regarding the complaints about his lab and office, his unwillingness to remedy the situation,

and the incident with UTSA police.[1]   On February 16, 2001, Dr. Bailey interviewed Dr. Stotter.  During the interview, according to Dr. Bailey, Dr. Stotter admitted that the lab had safety issues but stated that it was not his fault because several faculty members were using the lab for storage.  He indicated that a student was going to help him clean it at some uncertain future date.  With respect to his office, he indicated that he used it for storage and that his attempts to clean it had fallen through.  Dr. Bailey also inquired about Dr. Stotter's prior email regarding medical leave.  He advised Dr. Stotter that UTSA officials thought the matter was resolved back in 1992.  After the meeting, Dr. Bailey concluded that he could not rely on Dr. Stotter to clean his lab.

On February 23, 2001, Dr. Bailey sent a certified letter to Dr. Stotter informing him that UTSA closed his lab and that UTSA would clean it on February 26, 2001.  The letter instructed Dr. Stotter to contact Dr. Hammond prior to February 26, 2001 to arrange for a police escort if he had any personal items to pick up.  Notice of the letter did not reach Dr. Stotter until February 28, 2001, two days after the clean up had already occurred.  On March 7, 2001, UTSA permitted Dr. Stotter to enter his lab.  According to Dr. Stotter, UTSA discarded all of his personal property that was stored in his lab.

On April 2, 2001, Dr. Bailey recommended to Dr. Romo that Dr. Stotter's contract be terminated for good cause.  On May 1, 2001, Dr. Romo sent a letter to Dr. Stotter extending him an opportunity to meet and discuss the matter. They met on May 11, 2001.  After reviewing the allegations, Dr. Romo agreed to terminate Dr. Stotter's contract for good cause.

On the same day, Dr. Stotter filed suit in state court against UTSA, Dr. Bailey, and UTSA Associate Vice President of Academic Affairs Dr. David

---

[1] Dr. Stotter alleges that at the same time similar problems still existed with Dr. Thayagarajan's lab.  According to UTSA, however, Dr. Thayagarajan took responsibility for his lab, but was unable to finish the cleanup because of health-related issues.  Thereafter, Dr. Thayagarajan worked with UTSA to close his lab in 1999 and retired in 2000.

Johnson[2] alleging a § 1983 procedural due process claim and seeking a temporary restraining order, a preliminary injunction, and declaratory relief. A temporary restraining order issued and the case was subsequently removed to federal court. On August 7, 2001, a motion for a preliminary injunction was denied.

Meanwhile, Dr. Stotter invoked the grievance procedures at UTSA. According to those procedures, a panel of UTSA tenured professors hear the grievance in the first instance and make a recommendation to the Board of Regents, which then approves, rejects, or amends the hearing panel's findings. The Board of Regents is also required to state in writing the reason for its decision and send a notice of the decision to the accused faculty member.

After a four-day hearing, the grievance panel reached an unanimous decision that there was no good cause to terminate Dr. Stotter's contract. Nonetheless, on February 14, 2002, the Board of Regents, with the exception of one abstaining Regent, voted to terminate Dr. Stotter's contract. On February 20, 2002, the Board of Regents sent a certified letter to Dr. Stotter explaining that although it accepted the findings of fact of the grievance panel, it rejected the conclusion that no good cause existed for termination.

Dr. Stotter proceeded with his § 1983 procedural due process claim in federal court. He also filed a separate lawsuit against UTSA, the Board of Regents, Dr. Bailey, and Dr. Romo alleging equal protection and First Amendment violations arising out of his termination. The district court consolidated the two suits. On November 22, 2005, the district court granted summary judgment in favor of the defendants, filing a revised order on December 27, 2005, granting the same. On February 27, 2006, Dr. Stotter filed an untimely notice of appeal, along with a timely motion to extend the time to

---

[2] The district court granted Dr. Johnson's motion to dismiss on qualified immunity grounds. Dr. Stotter did not appeal that decision and the issue is not before us.

file a notice of appeal. Finding good cause, the district court granted the motion. This appeal followed.

## II. STANDARD OF REVIEW

We review a district court's summary judgment ruling de novo, applying the same standard as the district court. Wyatt v. Hunt Plywood Co., 297 F.3d 405, 408 (5th Cir. 2002). A party is entitled to summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, this court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. See Hockman v. Westward Commc'ns, L.L.C., 407 F.3d 317, 325 (5th Cir. 2004). In reviewing the evidence, this court must therefore "refrain from making credibility determinations or weighing the evidence." Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 343 (5th Cir. 2007).

## III. Analysis

### A. Timeliness of Notice of Appeal

UTSA argues that the district court erred in granting Dr. Stotter's motion to file an untimely notice of appeal. We disagree. The district court entered its amended order of summary judgment on December 27, 2005. Thus, any notice of appeal was due on January 26, 2006. See Fed. R. App. P. 4(a)(1)(A). However, Rule 4(a)(5)(A) permits the district court to extend that time if (1) the party so moves no later than 30 days after the time prescribed by Rule 4(a) expires and (2) the party shows excusable neglect or good cause. On February 27, 2006, Dr. Stotter filed a timely motion to extend the time for filing a notice of appeal. The district court granted the motion on the ground that Dr. Stotter established

excusable neglect based on the fact that his counsel accidentally entered the incorrect year into her new computer-based calendar.

This court reviews a district court's ruling on a Rule 4(a)(5) motion based on a determination of excusable neglect for an abuse of discretion. United States v. Clark, 51 F.3d 42, 43 n.5 (5th Cir. 1995). However, this court gives more leeway to a district court's determination of excusable neglect when the district court grants the motion for an extension of time. Midwest Employers Cas. Co. v. Williams, 161 F.3d 877, 879 (5th Cir. 1998).

When evaluating excusable neglect under Rule 4(a)(5), this court relies on the following standard:

> The determination is at bottom an equitable one, taking account all of the relevant circumstances surrounding the party's omission. These include . . . the danger of prejudice . . . , the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

Id. (quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993)). Given the leeway granted to district courts under this standard, the minimal delay and prejudice involved, and the excuse provided by Dr. Stotter, we conclude that the district court did not abuse its discretion in granting the motion to extend the time for filing a notice of appeal.

## B. Section 1983 - Procedural Due Process Claim

### 1. UTSA

Dr. Stotter filed his procedural due process claim pursuant to Title 42 of the United States Code, Section 1983. Section 1983 provides a private right of action for damages to individuals who are deprived of "any rights, privileges, or immunities" protected by the Constitution or federal law by any "person" acting under the color of state law. 42 U.S.C. § 1983. The Supreme Court has held that "neither a state or persons acting in their official capacities are 'persons' under

§ 1983," though state officials in their official capacities, when sued for injunctive relief, are "persons" under § 1983. Will v. Michigan State Dep't of Police, 491 U.S. 58, 71 & n.10 (1989); see also Lapides v. Bd. of Regents of the Univ. Sys. of Georgia, 535 U.S. 613, 617 (2002). This court has also recognized that state universities as arms of the state are not "persons" under § 1983. Laxey v. Louisiana Bd. of Trustees, 22 F.3d 621, 623 n.2 (1994); Texas v. Walker, 142 F.3d 813, 820 n.10 (5th Cir. 1998) (noting specifically that University of Texas Health Science Center and Regents of the University of Texas are arms of the state); see also Gaby v. Bd. of Trs., 348 F.3d 62 (2d Cir. 2003). Thus, Dr. Stotter's § 1983 claim, with respect to UTSA, is invalid.

## 2. Dr. Bailey

Dr. Stotter argues that Dr. Bailey violated his procedural due process rights by discarding his personal property without giving him sufficient opportunity to retrieve it. The district court conceded that the February 23, 2001 notice letter was insufficient to give Dr. Stotter sufficient time to remove any personal items from his lab prior to the February 26, 2001 cleanup. We agree. In fact, Dr. Stotter did not even receive the notice letter until after his lab was cleaned and his personal property allegedly discarded. Nonetheless, the district court granted the motion for summary judgment in favor of the defendants on two grounds. First, the district court held that because an adequate post-deprivation remedy was available, i.e., a state conversion claim, Dr. Stotter could not establish a procedural due process violation. Dr. Stotter counters that there is no adequate post-deprivation remedy available in this case because the defendants are immune from suit under the Texas Tort Claims Act. See Tex. Civ. Prac. & Rem. Code § 101.021 (2007). Dr. Stotter is correct that under Texas law, conversion is considered an intentional tort for which the Texas Tort Claims Act preserves immunity. See Tex. River Barges v. City of San Antonio, 21 S.W.3d 347, 356-57 (Tex. App. 2000). However, we need not address

the issue of whether a defendant's entitlement to immunity renders a post-deprivation remedy unavailable because Dr. Stotter is not required to establish the unavailability of post-deprivation remedies in this case.

Under the Parratt/Hudson doctrine "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984); see also Parratt v. Taylor, 451 U.S. 527 (1981), overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986). The key word is "unauthorized." The Supreme Court later clarified that if the deprivation was authorized by the state and the state had an opportunity to provide some type of pre-deprivation remedy, failure to do so implicates the due process clause. Zinermon v. Burch, 494 U.S. 113, 127-30 (1990). In applying Zinermon, this circuit has held that a § 1983 action for deprivation of procedural due process is barred if a state has adequate post-deprivation remedies and the following conditions exist: (1) the deprivation must truly have been unpredictable or unforeseeable; (2) pre-deprivation process would have been impossible or impotent to counter the state actors' particular conduct; and (3) the conduct must have been unauthorized in the sense that it was not within the officials' express or implied authority. Caine v. Hardy, 943 F.2d 1406, 1413 (5th Cir. 1991) (en banc). Otherwise, a § 1983 action for deprivation of procedural due process is not barred under the Parratt/Hudson doctrine.

Here, the deprivation was both predictable and foreseeable. In fact, not only was it possible for Dr. Bailey to provide a pre-deprivation remedy in this case, he attempted to do so by sending Dr. Stotter a letter giving him an opportunity to remove any personal items from his lab. Moreover, UTSA and Dr. Bailey specifically authorized the deprivation. See, e.g., Allen v. Thomas, 388

F.3d 147, 149 (5th Cir. 2004) (holding that because personal property was confiscated under authority of prison administrative directive, it was not random or unauthorized); Brooks v. George County, 84 F.3d 157, 165 (5th Cir. 1996) (holding that actions according to official policy cannot be considered random or unauthorized). In short, because the alleged deprivation was authorized, the deprivation was foreseeable, Dr. Bailey had an opportunity to provide a pre-deprivation remedy, and he failed to give Dr. Stotter sufficient time to collect his personal items prior to allegedly discarding them, the district court erred in dismissing Dr. Stotter's procedural due process claim on the basis of the availability of an adequate post-deprivation remedy.

The second reason the district court dismissed Dr. Stotter's procedural due process claim was because, according to the district court, Dr. Stotter failed to identify any particular item that was removed from his lab in which he had a sufficient property interest. We disagree. Property interests protected by the procedural due process clause include, at the very least, ownership of real estate, chattels, and money. Bd. of Regents v. Roth, 408 U.S. 564, 572 (1972); Mahone v. Addicks Util. Dist., 836 F.2d 921, 929 (5th Cir. 1988). In concluding that Dr. Stotter did not have a property interest in any of the materials in his lab, the district court failed to construe the evidence in a light most favorable to him. After reviewing the record, there appears to be no evidence or inventory of what was actually removed from the lab. In his affidavit, however, Dr. Stotter states that when he began his employment at UTSA, he brought with him book cases, storage cabinets, a chemical library, personal journals, notebooks, documentation that reflected research and work generated during his tenure at UTSA, and many non-inventoried chemicals and related materials not purchased by UTSA or with any funds belonging to UTSA. He also alleges that Dr. Bailey discarded these items. Construing this evidence in a light most favorable to Dr. Stotter, a reasonable juror could conclude that he had a property

interest in the aforementioned items and Dr. Bailey violated his procedural due process rights by discarding them without giving Dr. Stotter sufficient opportunity to retrieve them. In fact, by giving Dr. Stotter an opportunity to retrieve any personal items, Dr. Bailey effectively conceded that at least as of February 23, 2001, Dr. Stotter had not waived any personal property interest in the items he placed in his lab. Based on the foregoing, we conclude that the district court erred in not finding a procedural due process violation in this case.

Because we hold that Dr. Stotter has set forth sufficient evidence to establish a constitutional violation, we must next address whether Dr. Bailey is entitled to qualified immunity. Indeed, notwithstanding the broad language of § 1983, state officials performing discretionary functions are often protected from liability by the doctrine of qualified immunity, which shields such officials from suit "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" McClendon v. City of Columbia, 305 F.3d 314, 322 (5th Cir. 2002) (en banc) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To determine whether an official is entitled to qualified immunity from a suit alleging a constitutional violation, we conduct a familiar two-step inquiry. First, we must ask whether the plaintiff has alleged facts to establish that the official violated the plaintiff's constitutional rights. Hope v. Pelzer, 536 U.S. 730, 736 (2002); Saucier v. Katz, 533 U.S. 194, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"). If the facts do not establish that the official violated the plaintiff's constitutional rights, we need not inquire further. See Saucier, 533 U.S. at 201. If they do, the official is nonetheless entitled to qualified immunity unless the court finds that the official's conduct was objectively unreasonable in light of clearly established law at the time of the

state actions at issue. See McClendon, 305 F.3d at 323. To be "clearly established" for purposes of qualified immunity, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Johnson v. Johnson, 385 F.3d 503, 524 (5th Cir. 2004) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

Here, the Supreme Court has recognized that the due process clause protects a person's property interests in personal property such as real estate, chattels, and money. Roth, 408 U.S. at 576. In Zinermon, the Supreme Court reiterated that some type of notice is required prior to the authorized deprivation of one's property. 494 U.S. at 127-28. However, as the district court correctly concluded, the notice Dr. Bailey gave Dr. Stotter was insufficient to satisfy due process because Dr. Stotter did not receive the notice until after his personal property was allegedly discarded. Based on these precedents, a reasonable state official would understand that discarding Dr. Stotter's personal property in this manner violated his procedural due process rights and that such conduct is objectively unreasonable. Thus, we agree that Dr. Bailey is not entitled to qualified immunity with respect to Dr. Stotter's procedural due process claim.

## C. Equal Protection Claims

Dr. Stotter next argues that the defendants treated him differently than others similarly situated in violation of his equal protection rights. In Village of Willowbrook v. Olech, 528 U.S. 562 (2000), the Supreme Court recognized an equal protection claim based on a "class of one." To establish such a claim, the plaintiff must show that (1) he or she was treated differently from others similarly situated and (2) there was no rational basis for the disparate treatment. Id. at 564.[3] We agree that Dr. Stotter has not established that he

[3] The district court granted summary judgment in favor of the defendants with respect to the equal protection claim on the ground that Dr. Stotter did not establish vindictive animus on the part of the defendants. In doing so, the district court relied on Hilton v. City of Wheeling, 209 F.3d 1005 (7th Cir. 2000). However, this court has rejected the argument that

was treated differently than others similarly situated or that any differential treatment was irrational.

The district court concluded that despite the dearth of evidence regarding the conditions of Dr. Thayagarajan's lab, the two labs had similar hazards and thus, Drs. Stotter and Thayagarajan were similarly situated. However, Dr. Thayagarajan initially took responsibility for the deficiencies of his lab and when his health problems prohibited him from cleaning it, he turned his lab over to UTSA and retired shortly thereafter. Dr. Stotter has not offered any evidence to dispute these facts. In fact, when asked if he knew that Dr. Thayagarajan cooperated with UTSA to clean his lab, Dr. Stotter responded at deposition, "I don't know that." In contrast, Dr. Stotter made several unfulfilled promises to clean his lab. Indeed, even under his version of the facts, he was given notice on October 31, 2000, to clean his lab and by the end of February, 2001, still had not done so. Also, unlike Dr. Thayagarajan, Dr. Stotter allowed deficiencies to exist in his office, in addition to his lab, and when UTSA attempted to remedy the situation, Dr. Stotter created such a scene that he was escorted to his car by UTSA police and advised to leave the premises. There is no evidence that Dr. Thayagarajan ever physically resisted efforts to clean his lab. Thus, the two situations are hardly similar and the confrontation with campus police alone presents, at the very least, a rational basis for treating Dr. Stotter differently. Accordingly, we conclude that Dr. Stotter's equal protection claim lacks merit.

Dr. Stotter also raises an equal protection claim with respect to his salary. He argues that the district court ignored this claim. However, a review of the record reveals that the district court did address this claim. According to the district court, any differential in salary was the result of Dr. Stotter's own failure to submit annual reports required for a salary adjustment. The district court

---

all "class of one" equal protection claims require a showing of vindictive animus. See Mikeska v. City of Galveston, 451 F.3d 376, 381 n.4 (5th Cir. 2003).

also noted that all of the correspondence from Dr. Stotter's superiors indicates a willingness to rectify any legitimate shortfall in his salary. Dr. Stotter does not offer any evidence to the contrary. Moreover, an independent review of the record also reveals that Dr. Stotter has not offered any evidence comparing his salary to any other individual, let alone an individual similarly situated. Even if he had, the failure to file the requisite paperwork for a salary adjustment would certainly provide a rational basis for any alleged salary differential. Accordingly, we conclude that this equal protection claim also lacks merit.

### D. First Amendment Retaliation Claim

Dr. Stotter argues that the defendants terminated his employment contract in retaliation for his speech involving matters of public concern in violation of the First Amendment. The district court granted summary judgment in favor of the defendants on the ground that Dr. Stotter was unable to establish that the speech at issue was a matter of public concern. We agree.

In order to succeed on a First Amendment retaliation claim, Dr. Stotter must show that (1) he suffered an adverse employment decision; (2) his speech involved a matter of public concern; (3) his interest in commenting on matters of public concern outweighs his employer's interest in promoting efficiency; and (4) his speech motivated the adverse employment decision. Whiting v. The Univ. of S. Miss., 451 F.3d 339, 350 (5th Cir. 2006); Beattie v. Madison County Sch. Dist., 254 F.3d 595, 601 (5th Cir. 2001); Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 220 (5th Cir. 1999). The district court held that Dr. Stotter was unable to establish the second element because the memo at issue was a private grievance about wages instead of a matter of public concern.

To determine whether an employee's speech addresses a matter of public concern, this court has employed two tests, sometimes used in conjunction with each other. In the first test, this court evaluates the content, form, and context of a given statement. Bradshaw v. Pittsburgh Indep. Sch. Dist., 207 F.3d 814,

818 (5th Cir. 2000); Teague v. City of Flower Mound, 179 F.3d 377, 383 (5th Cir. 1999). The second test is the citizen-employee test:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

Connick v. Myers, 461 U.S. 138, 147 (1983); see also Finch v. Fort Bend Indep. Sch. Dist., 333 F.3d 555, 563-64 (5th Cir. 2003). Under this latter "shorthand" test, this court focuses on whether the plaintiff "[spoke] primarily in his role as a citizen rather than as an employee addressing matters only of personal concern." Fiesel v. Cherry, 294 F.3d 664, 668 (5th Cir. 2002). However, the citizen-employee test can sometimes yield indeterminate results because "[t]he existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern." Dodds v. Childers, 933 F.2d 271, 273 (5th Cir. 1991). Thus, "[i]n cases involving mixed speech, we are bound to consider the Connick factors of content, context, and form, and determine whether the speech is public or private based on these factors." Teague, 179 F.3d at 382.

There has been some confusion in this circuit regarding mixed speech cases, i.e., cases in which the employee speaks on a matter of public concern but also has a personal interest as well. See Kennedy v. Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 367 (5th Cir. 2000) (discussing the history of mixed speech cases in the this circuit). Neither the district court nor the parties address the issue of whether this case involves mixed speech. Dr. Stotter does argue that a reference to a previously-raised issue regarding the misuse of his benefits in a personal memo discussing wages transforms his entire memo into protected speech. This argument sounds like a mixed speech argument.

At first glance, it is doubtful that a vague reference to a previously-raised issue regarding the alleged misuse of benefits in a four-page memo that otherwise constitutes a personal grievance about wages is sufficient to place the entire memo into the mixed speech genre. However, this circuit has not been entirely clear on this issue. In Wilson v. UT Health Ctr., 973 F.2d 1263, 1269 (5th Cir. 1992), this court interpreted Supreme Court precedent as "remov[ing] from First Amendment protection only that speech that is made only as an employee, and le[aving] intact protection for speech that is made both as an employee and as a citizen." Another panel of this court criticized the broad language in Wilson, recognizing that "[t]he mere insertion of a scintilla of speech regarding a matter of public concern would make a federal case out of a wholly private matter fueled by private, non-public interests." Teague, 179 F.3d at 382. A third panel of this court, however, criticized Teague and reiterated that under Connick, First Amendment protection is only categorically denied to public employees speaking solely on matters of personal interest. Kennedy, 224 F.3d at 370 n.13 (citing Connick, 461 U.S. at 157). Thus, according to that panel, a mere scintilla of speech regarding a matter of public concern is sufficient to treat the entire communication as mixed speech. Id. at 372-73. In evaluating these cases, a fourth panel of this court, in an unpublished opinion, reached the same conclusion. Chavez v. Brownsville Indep. Sch. Dist., 135 F. App'x 664, 670 (5th Cir. Jun. 15, 2005). We agree that under Connick, even a mere scintilla of speech regarding a matter of public concern is sufficient to treat the entire communication as mixed speech. Thus, because Dr. Stotter made an allegation of malfeasance by state officials, which arguably is an issue of public concern, see Thompson v. City of Starkville, 901 F.2d 456, 463 (5th Cir. 1990) (citation omitted), the memo at issue should be treated as mixed speech.

As recognized by this court in Chavez, we have used varying approaches with respect to analyzing mixed speech cases. For example, some panels have

focused on the content-form-context test and then used the citizen-employee test in the alternative. See, e.g., Kennedy, 224 F.3d at 375-76; Teague, 179 F.3d at 382; Thompson, 901 F.2d at 461-66. Other panels have incorporated the citizen-employee test into the content portion of the content-form-context test. See, e.g., Harris, 168 F.3d at 222; Davis v. Ector County, 40 F.3d 777, 783 (5th Cir. 1994); Dodds, 933 F.2d at 274; Moore v. City of Kilgore, 877 F.2d 364, 370 (5th Cir. 1989). Still, other panels have focused on the citizen-employee test and used the content-form-context test only to aid in that analysis. See, e.g., Gillum v. City of Kerrville, 3 F.3d 117, 121 (5th Cir. 1993). Because application of these varying approaches would lead us to the same conclusion, i.e., that the memo at issue does not constitute protected speech, we need not decide which approach is appropriate to use in mixed-speech cases.[4]

It is undisputed that the memo at issue is primarily a private grievance about wages. Indeed, to support his claim, Dr. Stotter cites to a single sentence, buried within his four-page memo, in parenthesis no less, discussing an instruction he was allegedly given not to file his annual wage report:

> Since that time, no one in the Provost's Office has modified or clarified those instructions, despite requests from me and/or from the EPS director for some resolution of the original administrative issues I raised (concerning my appointment status and administrative misuse of my benefits at UTSA from 1989-1991 and then continuing through 1993).

---

[4] We do recognize that the distinctions between these varying approaches is somewhat artificial. Indeed, it seems clear that the question of whether an employee was speaking as a "citizen" or as an "employee" under the citizen-employee test is sufficiently covered by the content and context prongs of the content-form-context test. Thus, we fail to discern any significant difference between these varying approaches used to analyze mixed speech cases given that they ultimately ask the same question. In fact, we have been unable to find a single case in which the application of these varying tests brought the panel to different conclusions. See, e.g., Kennedy, 224 F.3d at 375 ("Though we are not obligated to apply the citizen-employee test in mixed speech cases, we observe that it produces an identical conclusion."); Teague, 179 F.3d at 383 ("Utilizing the simpler 'citizen versus employer' approach produces . . . the same result.").

Based on this passing reference to an issue he apparently raised years ago, which he never substantiates nor explains, Dr. Stotter maintains that his entire memo is protected speech. In evaluating the content, form, and context of this memo, it primarily, if not exclusively, is nothing more than an employer-employee dispute about wages. Indeed, the title of his memo is "Compression Salary Adjustment Beginning AY 2000-1 and Related Matters" and the content deals exclusively with Dr. Stotter's concern over not receiving a "long overdue review of [his] salary status." Internal personnel disputes and management decisions are rarely a matter of public concern. Branton v. City of Dallas, 272 F.3d 730, 739 (5th Cir. 2001). There is simply no evidence that in writing this memo, Dr. Stotter was trying to publicize allegations of corruption. In fact, he does not even complain about the purported misuse of benefits in the memo, only referring to the issue in passing as an explanation for his failure to produce his annual reports. He further notes in the memo his hope that "we can separate the salary issues from the other problems and initially resolve the salary question - quickly and amicably, for many reasons." We agree with the district court that at all times, "Dr. Stotter was speaking as an aggrieved employee, about a classic employment issue: compensation." In short, Dr. Stotter is attempting to take a personal grievance about his wages and turn it into a First Amendment retaliation claim based on some vague reference to a previously-raised issue regarding his benefits. "Post hoc metamorphoses fall short of the constitutional threshold." Bradshaw, 207 F.3d at 818. Accordingly, we conclude that Dr. Stotter's First Amendment retaliation claim lacks merit.

## IV. CONCLUSION

For the reasons stated herein, we affirm the district court's judgment with respect to the equal protection and First Amendment retaliation claims and

reverse the district court's judgment with respect to the § 1983 procedural due process claim. Accordingly, with respect to UTSA, the Board of Regents, and Dr. Romo, we affirm the district court's judgment as to all claims against them; with respect to Dr. Bailey, we remand the procedural due process claim to the district court for proceedings consistent with this opinion.

AFFIRMED, IN PART; REVERSED, IN PART; and REMANDED.